**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION**

| | |
|---|---|
| KC TENANTS,<br><br>　　　　　　　　　　Plaintiff,<br><br>-against-<br><br>DAVID M. BYRN, in his official capacity as the Presiding Judge for the 16th Judicial Circuit Court, Jackson County, Missouri; and MARY A. MARQUEZ, in her official capacity as the Court Administrator for Jackson County, Missouri,<br><br>　　　　　　　　　　Defendants. | No. 20-cv-784 |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiff KC Tenants hereby allege for this complaint for declaratory and injunctive relief, as follows:

**PRELIMINARY STATEMENT**

1.　　This action challenges Administrative Order No. 2020-154 ("Administrative Order"), issued by the 16th Judicial Circuit Court for Jackson County, Missouri, under the Supremacy Clause and core civil rights and civil liberties guaranteed by the U.S. Constitution, including the Due Process Clause of the Fourteenth Amendment. In an effort to prevent severe and far-reaching public health consequences caused by evictions during a global health pandemic, the Centers for Disease Prevention and Control ("CDC") issued a temporary nationwide moratorium on evictions for nonpayment of rent, effective September 4, 2020 until December 31, 2020 ("Moratorium"). The federal Moratorium broadly prohibits *any action* to remove or cause the

removal of a tenant from a residential property for nonpayment of rent where the tenant has submitted a declaration under penalty of perjury that they satisfy certain eligibility requirements. Despite the Moratorium's broad prohibitions and stated purpose of preventing further spread of COVID-19, the Administrative Order overrides the Moratorium's grant of temporary immunity from evictions by expressly permitting landlords to file and pursue eviction actions, regardless of whether tenants submitted declarations pursuant to the federal Moratorium; creating a system of eviction-related evidentiary hearings to allow landlords to challenge tenants' declarations in any and all cases and continue to pursue eviction actions; and allowing landlords to pursue writs of execution for evictions by simply submitting a "verification" to the Court that the Moratorium does not apply at any point prior to the issuance of the writ. The Administrative Order, and Defendants' implementation thereof, directly conflicts with the express provisions of the federal Moratorium, is impossible to reconcile, and serves as an obstacle to the full purposes and objectives of the Moratorium as well as the statute and regulation that authorize it. Moreover, Defendants' implementation of the Administrative Order denies tenants, including Plaintiff's members, of adequate notice and opportunity to be heard prior to depriving them of their right to temporary immunity from eviction actions for nonpayment of rent under the federal Moratorium.

**PARTIES**

2.     Plaintiff KC Tenants is a Missouri nonprofit corporation led by and comprised of tenants in Kansas City, Missouri. The mission of KC Tenants is to ensure that everyone in Kansas City has safe and accessible housing through organizing, direct support, and community outreach and education. KC Tenants also staffs and manages a tenant hotline for Kansas City renters seeking assistance with evictions and other housing-related concerns.

2

3.     Defendant David M. Byrn is the Presiding Judge of the 16th Judicial Circuit Court, Jackson County, Missouri. Defendant Byrn is sued in his official capacity. In his role as Presiding Judge, Defendant Byrn has general administrative authority over all judicial personnel and court officials anywhere in the Circuit. Mo. Rev. Stat. § 478.240(2). Defendant Byrn also has administrative authority over the dockets of the Court and administrative authority regarding the manner in which any hearings are conducted in the Court. *Id.* Defendant Byrn's actions, as alleged in this Complaint, are under the color of Missouri state law and constitute state action within the meaning of the U.S. Constitution and 42 U.S.C. § 1983.

4.     Defendant Mary A. Marquez is the Court Administrator for Jackson County, Missouri. Defendant Marquez is sued in her official capacity. The Court Administrator for Jackson County exercises all of the powers and duties of the circuit clerk. Mo. Rev. Stat. § 483.015(2). In her role as Court Administrator, Defendant Marquez performs the administrative functions of the Court and the circuit clerk functions regarding civil process. *Id.* §§ 483.240, 483.241, 483.245. Defendant Marquez's actions, as alleged in this Complaint, are under the color of Missouri state law and constitute state action within the meaning of the U.S. Constitution and 42 U.S.C. § 1983.

**JURISDICTION AND VENUE**

5.     This action arises under the U.S. Constitution and the provisions of 42 U.S.C. § 1983.

6.     This case presents a federal question within this Court's jurisdiction under Article III, § 2, of the U.S. Constitution, and 28 U.S.C. §§ 1331 (federal question) and 1343(a) (civil rights).

7.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because it is the District in which Defendants maintain offices and exercise their authority in their official

capacities, and the District in which substantially all of the events or omissions giving rise to these claims occurred.

8.      Venue is proper in the Western Division of this Court pursuant to W.D. Mo. Local Rule 3.2(a)(1)(A).

## FACTS

### The COVID-19 Pandemic

9.      Since the United States declared a national emergency, the COVID-19 pandemic has inflicted widespread and unprecedented public health and economic harms for hundreds of millions of Americans. As of September 24, 2020, about 13 million Americans remain unemployed due to the pandemic, and the number of initial unemployment claims in the United States has begun to rise again as mass layoffs persist and fiscal stimulus benefits expire. Ben Casselman, *Job Rebound Is 'Losing Steam' as Crisis Passes Six-Month Mark*, N.Y. Times, Sept. 24, 2020, https://www.nytimes.com/2020/09/24/business/economy/unemployment-claims.html; *see also* News Release, U.S. Dep't of Labor, *Unemployment Insurance Weekly Claims* (Sept. 24, 2020), https://www.dol.gov/sites/dolgov/files/OPA/newsreleases/ui-claims/20201814.pdf.  Over 7.2 million Americans have contracted COVID-19, and at least 205,650 have died.  N.Y. Times, *Covid in the U.S.: Latest Map and Case Count* (Sept. 29, 2020), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html.

10.      The severe public health and economic consequences of the COVID-19 pandemic have also reached Missouri. The unemployment rate in Missouri remains a staggering 7.0%, with more than 829,600 initial claims filed in the 28 weeks since Governor Parsons declared a state of emergency. Mo. Dep't of Labor & Indus. Relations, *Data and Statistics* (Sept. 27, 2020), https://labor.mo.gov/data. Over 128,000 Missourians have contracted COVID-19, and at least

2,130 have died. N.Y. Times, *Missouri Covid Map and Case Count* (Sept. 29, 2020), https://www.nytimes.com/interactive/2020/us/missouri-coronavirus-cases.html.

11.     Despite these staggering numbers and ongoing economic fallout, Missouri remains one of the few states in the nation that has not issued a statewide eviction moratorium to protect tenants from being forced out of their homes during a global health pandemic. Annie Gowen, *Thousands have been evicted in the pandemic. Housing experts say Trump's new ban is a temporary fix.*, Wash. Post, Sept. 3, 2020, https://www.washingtonpost.com/national/thousands-were-evicted-during-the-pandemic-housing-advocates-say-trumps-new-ban-is-a-temporary-fix/2020/09/03/f0f9bd2e-e5a2-11ea-970a-64c73a1c2392_story.html.

12.     At the beginning of the pandemic, the 16th Judicial Circuit Court of Jackson County issued a temporary moratorium on issuing and enforcing writs of execution, which expired on May 31, 2020. *In re: Extension of Suspension of Issuance and Enforcement of Writs of Restitution, Writs of Replevin, Writs of Attachment, Writs of Garnishment and any other Writs of Execution*, Administrative Order No. 2020-082 (May 7, 2020). Since May 31, 2020, however, the 16th Judicial Circuit Court has aggressively processed new eviction actions and conducted eviction hearings, despite federal, state, and local advocates' persistent efforts to call attention to the public health consequences of evictions and the grave constitutional issues with such proceedings. *See, e.g.*, Gowen, *supra* ¶ 11; Phillip Sitter, *Missouri housing advocates: Halt evictions for now*, Jefferson City News Tribune, Aug. 21, 2020, https://www.newstribune.com/news/local/story/2020/aug/21/missouri-housing-advocates-halt-evictions-for-now/838380/.

13.     The severe public health consequences of eviction are well documented. People facing eviction, even before they lose their homes, are "more likely to report poor health, high

blood pressure, depression, anxiety, and psychological distress." Allison Bovell-Ammo & Megan Sandel, *The Hidden Health Crisis of Eviction*, Boston Univ. Sch. of Pub. Health, Oct. 5, 2018, https://www.bu.edu/sph/2018/10/05/the-hidden-health-crisis-of-eviction/. Eviction also "often leads to residential instability, moving into poor quality housing, overcrowding, and homelessness, all of which [are] associated with negative health among adults and children." *Id.*

14.     Children who experience eviction and housing instability are especially vulnerable to short- and long-term health issues, including asthma, frequent ear infections and other physical illnesses, chronic health conditions, delayed development, behavioral issues, and anxiety. *See* Bridge Fund of N.Y., Inc., *Eviction Hits Children Hardest*, https://thebridgefund.org/2016/06/05/eviction-hits-children-most/; *see also* Megan Sandel et al., *Unstable Housing and Caregiver and Child Health in Renter Families*, 141 Pediatrics 2 (2018), https://childrenshealthwatch.org/wp-content/uploads/Unstable-Housing-and-Caregiver-and-Child-Health-in-Renter-Families.pdf.

15.     During a global pandemic, the public health consequences of eviction and housing instability are even greater. Displaced tenants face a heightened risk of contracting, spreading, and suffering complications from COVID-19. Michelle Conlin, *U.S. eviction bans are ending. That could worsen the spread of coronavirus*, Reuters, July 23, 2020, https://www.reuters.com/article/us-health-coronavirus-evictions-insight/u-s-eviction-bans-are-ending-that-could-worsen-the-spread-of-coronavirus-idUSKCN24O1EK. Some jurisdictions have observed a spike in COVID-19 cases following the expiration of eviction moratoria. *Id.*

16.     Importantly, eviction disproportionately burdens tenants of color and, in particular, Black women. The American Civil Liberties Union ("ACLU") analyzed national eviction data from 2012 to 2016, provided by the Eviction Lab at Princeton University, and found that Black

women renters, on average, had evictions filed against them at twice the rate of white renters (or higher) in 17 of 26 states—including Missouri. Sophie Beiers et al., *Clearing the Record: How Eviction Sealing Laws Can Advance Housing Access for Women of Color*, ACLU News & Commentary, Jan. 10, 2020, https://www.aclu.org/news/racial-justice/clearing-the-record-how-eviction-sealing-laws-can-advance-housing-access-for-women-of-color/.

17. Given these stark race and gender disparities, Black women renters and other tenants of color will suffer the greatest hardship due to the current eviction crisis—worsening the existing racial disparities that have emerged in the impact of the COVID-19 pandemic. *See* Samantha Artiga et al., *Racial Disparities in COVID-19: Key Findings from Available Data and Analysis*, Kaiser Family Foundation, Aug. 17, 2020, https://www.kff.org/racial-equity-and-health-policy/issue-brief/racial-disparities-covid-19-key-findings-available-data-analysis/.

18. To combat these consequences and an impending housing crisis, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which included a federal eviction moratorium. Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, § 4024 (2020). The CARES Act's eviction moratorium prohibited the filing of new eviction actions against tenants living in certain federally assisted or financed properties. *Id.* The CARES Act's protections expired on July 24, 2020. *Id.*

19. That same month, a study found that more than 40 percent of renter households in the United States—and over one-third of renter households in Missouri—were unable to pay rent and at imminent risk of eviction by the end of the year. Stout, *Estimation of Households Experiencing Rental Shortfall and Potentially Facing Eviction* (July 2020), https://app.powerbi.com/view?r=eyJrIjoiNzRhYjg2NzAtMGE1MC00NmNjLTllOTMtYjM2NjF

mOTA4ZjMyIiwidCI6Ijc5MGJmNjk2LTE3NDYtNGE4OS1hZjI0LTc4ZGE5Y2RhZGE2MSIsI

mMiOjN9.

20.     In the face of a looming eviction crisis and its certain impact on the further spread

of COVID-19, President Donald J. Trump issued an Executive Order on Fighting the Spread of

COVID-19 by Providing Assistance to Renters and Homeowners ("Executive Order") on August

8, 2020. Exec. Order No. 13945, 85 Fed. Reg. 49,935 (Aug. 8, 2020). The Executive Order cited

the CDC's conclusion that the pandemic's economic fallout "may lead to greater risk of eviction

and homelessness or sharing of housing," particularly for certain racial and ethnic minority groups.

*Id.* The Executive Order also recognized the CDC's observation that increased homelessness and

shared housing could, in turn, "exacerbate and amplify the spread of COVID-19," place those who

are older or have underlying medical conditions at "higher risk for severe COVID-19-associated

illness," and "result[] in increased in-person interactions between older, higher-risk individuals

and their younger relatives or friends." *Id.* The Executive Order further found that African-

American and Latinx individuals disproportionately experience eviction and, therefore, are most

at risk of its short- and long-term consequences. *Id.* at 49,936.

21.     Given these public health risks, the Executive Order found that the prevention of

evictions is critical to reducing the spread of COVID-19, and directed the Secretary of the Health

and Human Services ("HHS") and the Director of CDC to consider measures to temporarily halt

residential evictions for nonpayment of rent. *Id.*

22.     Since the issuance of the Executive Order, the numbers of reported cases and deaths

due to COVID-19 have continued to rise at an alarming rate across the country—including in

Jackson County. *See* Katie Moore, *Kansas City metro adds more than 500 COVID-19 cases, most

in      more      than      a      month*,      Kansas      City      Star,      Sept.      25,      2020,

https://www.kansascity.com/news/coronavirus/article246003905.html; *see also* Annika Merrilees, *Missouri reports record numbers of COVID-19 hospitalizations*, St. Louis Post-Dispatch, Sept. 26, 2020, https://www.stltoday.com/lifestyles/health-med-fit/coronavirus/missouri-reports-record-number-of-covid-19-hospitalizations/article_f52b9d40-f8dd-53ef-9aaf-ba9f1cddd367.html; Austin Huguelet, *Missouri in top five for COVID*, Examiner, Sept. 23, 2020, https://www.examiner.net/story/news/2020/09/23/missouri-covid-19-gov-parson-white-house-coronavirus-task-force/3506612001/.

23.    As COVID-19 cases continued to rise in Jackson County, Plaintiff KC Tenants joined other state and local organizations in sending Defendant Byrn a public letter to demand a reinstatement of an eviction moratorium on August 13, 2020. Jodi Fortino, *Kansas City Housing Advocates Ask Judge, Mayor For An End to Evictions Amid Pandemic*, KBIA, Aug. 13, 2020, https://www.kbia.org/post/kansas-city-housing-advocates-ask-judge-mayor-end-evictions-amid-pandemic#stream/0. The public letter underscored the severe public health consequences of proceeding with evictions in the midst of a global pandemic. *Id.*

24.    On August 13, 2020, Defendants issued a statement in response to Plaintiff's public letter, in which Defendants declined to reinstate the temporary eviction moratorium. *See* Circuit Ct. for Jackson Cty., Mo., *Court Statement in Response to Request to Reinstate Eviction Moratorium for At Least 6 Months* (Aug. 13, 2020), https://www.16thcircuit.org/Data/Sites/1/media/news/news_releases/court-statement-in-reponse-to-request-to-reinstate-eviction-moratorium--8-13-20.pdf. In doing so, Defendants stated: "If the Executive Branch of government (either the President or the Missouri Governor) executes a valid Executive Order creating a moratorium on evictions, the Court will enforce and give effect to such valid Order." *Id.*

9

25.     Despite the rapidly growing number of COVID-19 cases in Jackson County and throughout Missouri, the 16th Judicial Circuit Court has continued to process the filing of new eviction actions, hold eviction proceedings, and issue eviction judgments and writs of execution. Casey Tolan & Kyung Lah, *Neighborhoods at risk for Covid see disproportionately high eviction rates*, CNN, Sept. 29, 2020, https://www.cnn.com/2020/09/29/us/covid-evictions-cdc-moratorium-invs/index.html; *see also* Jodi Fortino, *supra* ¶ 23.

### The CDC's Nationwide Eviction Moratorium

26.     In recognition of the severe public health consequences of evictions during a pandemic, and in response to the Executive Order, the CDC, located within HHS, issued a nationwide moratorium on evictions for nonpayment of rent ("Moratorium"), pursuant to its authority under Section 361 of the Public Health Service Act (42 U.S.C. § 264) and its implementing regulations (42 C.F.R. § 70.2). Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19, 85 Fed. Reg. 55,292–97 (Sept. 4, 2020). The Moratorium is attached hereto as Exhibit 1. The Moratorium is effective from September 4, 2020 through December 31, 2020. *Id.*

27.     The CDC issued the Moratorium for the express purpose of preventing the further spread of COVID-19. *Id.* at 55,292–94.

28.     In the Moratorium, the CDC recognized that eviction moratoria serve as "effective public health measure[s] . . . to prevent the spread of communicable disease" in several ways. *Id.* at 55,292, 55,294. First, the Moratorium "facilitate[s] self-isolation by people who become ill or who are at risk for severe illness from COVID-19 due to an underlying medical condition." *Id.* The Moratorium also "allow[s] State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID-19." *Id.* The CDC

10

further recognized that "housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID-19" and makes it difficult for these settings to adhere to best practices. *Id.* Additionally, the CDC noted that "[u]nsheltered homelessness also increases the risk that individuals will experience severe illness from COVID-19." *Id.* at 55,292, 55,296.

29.      The Moratorium prohibits landlords, residential property owners, and other persons with a legal right to pursue eviction or possessory action from "evict[ing] any covered person from any residential property in any jurisdiction to which this Order applies during the effective period" of September 4, 2020 through December 31, 2020. *Id.* at 55,292–93, 55,296. A person violating the Moratorium may be subject to criminal penalties. *Id.* at 55,296.

30.      The Moratorium applies to all jurisdictions in the United States, except for: (1) any state, local, territorial, or tribal area with an eviction moratorium that provides the same or greater level of protections; and (2) American Samoa. *Id.* at 55,293. The Moratorium is clear that it reaches only those areas that have less protections from eviction than it provides and "does not preclude State, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this [Moratorium]." *Id.* at 55,294.

31.      Jackson County has no eviction moratorium of any kind. Missouri also has no statewide eviction moratorium. Accordingly, the Moratorium applies to Jackson County, Missouri.

32.      The Moratorium defines a "covered person" as any tenant, lessee, or resident of a residential property that provides their landlord or property owner with a declaration under penalty of perjury indicating that they meet the following five requirements:

- The individual "has used best efforts" to obtain all available rental or housing government assistance, *id.* at 55,293;

- The individual either: (i) "expects to earn no more than $99,000 in annual income" in 2020, (ii) "was not required to report any income in 2019 to the U.S. Internal Revenue Service," or (iii) received a stimulus check pursuant to the CARES Act, *id.*;

- The individual is "unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary out-of-pocket medical expenses," *id.*;

- The individual is "using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses," *id.*; and

- If evicted, the tenant would likely become homeless or move into and live in close quarters in a new congregate or shared living situation, *id.*

33.     The Moratorium provides that a tenant may use the CDC-provided declaration form, *see* Exhibit 2, or a "similar declaration under penalty of perjury." *Id.* The Moratorium does not specify a time by which a tenant must provide the information, and thus allows for its protections to be invoked at any point by the tenant.

34.     The Moratorium defines an "eviction" as "*any action* . . . to remove or cause the removal of a covered person from a residential property." *Id.* The Moratorium's prohibitions include all stages of an eviction action, including giving a notice to vacate, filing an eviction action, pursuing eviction-related hearings and proceedings, and obtaining and executing a final eviction judgment. *Id.*

12

35. To achieve its purpose of preventing the spread of COVID-19, the Moratorium mandates that it be interpreted and implemented to achieve three distinct objectives: (1) "[m]itigating the spread of COVID-19 within congregate or shared living settings, or through unsheltered homelessness," (2) "mitigating the further spread of COVID-19 from one U.S. State or U.S. territory," and (3) "supporting response efforts to COVID-19 at the Federal, State, local, territorial, and tribal levels." *Id.* at 55,293.

36. To comply with the federal Moratorium, state and local court officials must not facilitate or process *any stage* of an eviction for nonpayment of rent—e.g., filing new eviction actions, conducting eviction proceedings, or issuing and executing eviction judgments—where the tenant submitted a declaration under penalty of perjury that they are eligible for the Moratorium's protections.

37. The Moratorium limits state and local court officials' discretion in implementing and enforcing its provisions, and mandates that it be interpreted and implemented to achieve its named objectives to mitigate the spread of COVID-19 and support response efforts by the federal, state, and local governments.

38. Many courts across the country have applied the federal Moratorium and halted eviction filings and cases or imposed meaningful procedural mechanisms prior to the filing of new evictions, eviction proceedings, and issuance of eviction judgments and writs of execution.

### The 16th Judicial Circuit Court's Administrative Order

39. In a purported response to the CDC's Moratorium, Defendant Byrn issued Administrative Order No. 2020-154 for the 16th Judicial Circuit Court ("Administrative Order" or "Order"), effective as of September 4, 2020. *In re: Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19 in Response to Centers for Disease Control and Prevention Order Published on September 4, 2020*, Administrative Order No. 2020-154 (Sept. 4,

13

2020) . The Administrative Order is attached hereto as Exhibit 3. The 16th Judicial Circuit Court's Administrative Order purports to enforce the federal Moratorium in Jackson County courts.

40.     Defendant Byrn has "general administrative authority over all judicial personnel and court officials in the [16th Judicial] Circuit as well as administrative authority over dockets of the Court and the administrative and discretionary authority regarding the manner in which any hearings are conducted in the Court." *In Re: Updated Court Operations under Supreme Court Operational Directors – Effective September 25, 2020*, Administrative Order No. 2020-166 (Sept. 25, 2020), at 2.

41.     Defendant Marquez is responsible for carrying out and enforcing circuit clerk and administrative functions, such as those directed by the Administrative Order. Defendant Marquez also performs the sheriff functions regarding civil process.

42.     The Administrative Order expressly recognized the CDC's statutory authority to issue a federal eviction moratorium pursuant to 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2. Administrative Order, at 1.

43.     The Administrative Order is not required by state law or regulation, and conflicts with the CDC's exercise of federal authority pursuant to 42 U.S.C. § 264(a) and 42 C.F.R. § 70.2.

44.     In direct conflict with the Moratorium's broad prohibition against *any action* removing or causing the removal of tenants for nonpayment of rent, the Administrative Order expressly allows landlords to file new eviction actions and pursue eviction actions to judgment, regardless of whether a tenant submitted a declaration. *Id.* ¶ 4.

45.     Defendant Marquez, in her capacity as Court Administrator, establishes, administers, and oversees procedures for litigants to deliver and/or file pleadings and other documents with the Court—including for eviction actions. *See In Re: Court Operations During*

14

*COVID-19 Stay At Home/Shelter In Place Order*, Administrative Order No. 2020-073 (Apr. 16, 2020), ¶ 4.

46.    Upon information and belief, Defendant Marquez has accepted, or facilitated the acceptance of, new eviction filings for nonpayment of rent without asking or confirming that the tenant-defendant had not submitted a declaration pursuant to the Moratorium, in direct conflict with the Moratorium's mandates.

47.    The Administrative Order creates a system permitting landlords or property owners to "challenge the accuracy or veracity of any statements in the Declaration Form" by requesting an evidentiary hearing with the Court. Administrative Order, ¶ 7. Pursuant to this Administrative Order, Defendants authorized the Court to hold evidentiary hearings where the landlord or property owner may demand tenants' tax records, bank statements, and other personal or sensitive information. There is no minimum threshold or showing that is required of the landlord before requesting a hearing to challenge a tenant's declaration. In many cases, these evidentiary hearings will be far more intrusive than eviction proceedings and, in some cases, retaliatory against a tenant for exercising their rights under the federal Moratorium.

48.    These evidentiary proceedings will allow landlords or property owners to harass or retaliate against tenants who seek protection under the Moratorium, thereby discouraging tenants from exercising their federal rights.

49.    In direct conflict with the Moratorium's broad mandate, the Administrative Order allows landlords or property owners to pursue writs of execution against tenants for nonpayment of rent by simply submitting a "verification" form  that the Moratorium does not apply at any point before the issuance and/or service of any existing, pending, previously filed, or newly filed writs of execution. *Id.* ¶ 1. While the Administrative Order permits tenants to challenge landlords'

15

verifications by requesting an evidentiary hearing, *see id.* ¶¶ 2–3, this provision will force tenants to be brought into court for an eviction-related proceeding to defend their protections under the Moratorium, in direct conflict with the Moratorium's purpose and language.

50. Defendants are authorized to issue, or facilitate the issuance of, such writs of execution against tenants, as set forth by the Administrative Order.

51. Upon information and belief, due to Defendants' Administrative Order and its implementation, landlords and property owners have requested evidentiary hearings in nearly all pending eviction actions, where they have demanded tenants' payroll records, tax records, bank roll records, and documentation that tenants have sought government aid.

52. The Administrative Order, by its name and terms, governs the administrative operation of the Court. It is not an order issued to carry out the judicial function, as it was not issued by a judge in individual eviction cases, and no parties appeared before Defendant Byrn prior to his entry of the Administrative Order.

53. In addition to public health concerns, these evidentiary hearings raise grave due process concerns. Tenants who are ill, disabled, or medically vulnerable, and who would have faced difficulty in court proceedings before the pandemic, may now be entirely unable to respond to complaints or notices, seek legal help, file documents, appear for hearings, or otherwise participate in their defense under the current conditions.

54. Many tenants in Jackson County lack the ability to present documentary evidence, witness testimony, or other forms of evidence in remote hearings. Low-income tenants, in particular, often rely on outdated or damaged mobile devices, lack consistent Internet access (if they have it at all), have pay-as-you-go mobile plans, or otherwise face data constraints, and may experience utility or account shut-offs for nonpayment. Moreover, public resources, such as library

computers or free WiFi hotspots, often have time limits and force tenants to present their cases and disclose sensitive information in public settings.

55.    Remote proceedings in Jackson County have also obstructed the ability of tenants who are fortunate enough to have counsel to speak with their attorneys privately during a hearing. These proceedings are also particularly difficult for tenants who require language translation services or have other accessibility needs.

56.    These due process concerns are especially concerning with respect to the evidentiary hearings permitted by the Administrative Order—and may be even more consequential, as tenants could be subject to criminal perjury charges if they are unable to establish the accuracy or veracity of their declarations.

## INJURY TO PLAINTIFF KC TENANTS

57.    Founded in 2019, Plaintiff KC Tenants is a grassroots organization that provides direct outreach, community education, and support services to poor and working-class tenants facing eviction and other housing-related issues in Kansas City. KC Tenants is led by and comprised of a broad base of around 350 members. To achieve its objections, KC Tenants relies on its three paid staff members and volunteers.

58.    Prior to the COVID-19 pandemic, KC Tenants sought to ensure that everyone in Kansas City had a safe, accessible, and truly affordable home. In particular, KC Tenants dedicated its resources toward strategic campaigns to win a housing trust fund for Kansas City, organize tenant unions, and advance tenants' rights and protections.

59.    Since the declaration of a national emergency, KC Tenants has been on the frontlines of supporting Jackson County renters to avoid eviction and maintain stable housing during the pandemic. These efforts have included organizing direct actions and mobilizations,

17

advocating with local officials for tenants' protections, and providing direct support and referrals to tenants facing eviction.

60.    KC Tenants also launched a tenant hotline, where tenants facing eviction may seek information and referrals. The hotline is entirely managed and run by volunteers.

61.    After the CDC announced its Moratorium on September 2, 2020, KC Tenants staff and volunteers developed informational materials about the Moratorium's scope and requirements to share with Kansas City renters.

62.    When Defendants issued the Administrative Order on September 4, 2020, KC Tenants staff and volunteers were forced to halt distribution of these informational materials due to the apparent conflicts between the local Administrative Order and the federal Moratorium. The original informational materials, for example, advised that the Moratorium prohibited the filing of new evictions for nonpayment of rent where tenants submitted Declarations. Because the Administrative Order expressly allows landlords to file new evictions in any case, the original informational guide, based on the federal Moratorium, conflicted with Defendants' procedures and, therefore, risked providing tenants with misinformation.

63.    Since the beginning of the pandemic, KC Tenants has monitored Jackson County eviction filing data, which revealed that rent and possession eviction filings began to increase upon the Administrative Order's issuance after initially dropping following the CDC's announcement of the Moratorium.

64.    Because of the Administrative Order, KC Tenants has diverted significant resources—including staff time, volunteers, and financial resources—from its existing activities in order to mitigate the Administrative Order's harmful effects.

65.     As a direct result of the Administrative Order, KC Tenants has devoted increased resources toward weekly community outreach events, where staff members and volunteers canvass various neighborhoods to provide information and answer questions about the local Order. Moreover, after observing Defendants' implementation of the Administrative Order, KC Tenants has been forced to increase the number of shifts, hours, and volunteers dedicated to these canvassing efforts to ensure that tenants fully understand the Order and its harmful consequences—including the possibility of being called into court for intrusive and potentially retaliatory evidentiary hearings.

66.     KC Tenants has also spent additional resources on revising its Moratorium-related informational materials to account for the Administrative Order's conflicting provisions, procedures, and harmful consequences. KC Tenants was forced to expend resources on revising the informational guide to reflect the Defendants' actual enforcement of the Administrative Order and its conflicting provisions, and to include information and guidance regarding the risks that landlords may challenge or sue tenants who seek protection under the federal Moratorium.

67.     Due to the harmful consequences and added complexities of the Administrative Order, KC Tenants has organized and hosted several community workshops to share information about the Administrative Order and its implementation. KC Tenants also dedicated significant resources toward organizing a virtual program with local attorneys to fully explain, and answer questions regarding, the Order and its implementation for Jackson County tenants facing eviction. As a result of these urgent efforts related to the Administrative Order, KC Tenants diverted resources away from previously scheduled programs and activities.

68.     The Administrative Order has required KC Tenants to divert greater resources toward its tenant hotline to accommodate an increase in calls due to the Order. KC Tenants also

devoted staff time toward additional training for hotline volunteers on the added complexities and risks associated with the Administrative Order.

69.     The Administrative Order has forced, and will continue to force, KC Tenants to divert already scant resources away from its planned activities toward mitigating the Order's harmful consequences on Jackson County residents.

70.     The Administrative Order has discouraged tenants from seeking relief under the federal Moratorium out of fear that their landlords will bring them into court for invasive and unlawful evidentiary hearings. As a result, the Administrative Order has resulted in a chilling effect on tenants' exercise of their federal rights.

71.     Under the Administrative Order, Defendants have facilitated, and will continue to facilitate, the filing of new evictions for nonpayment of rent in violation of the Moratorium's language and intent against KC Tenants members who submitted declarations. In doing so, Defendants have denied, and will continue to deny, KC Tenants members and other tenants with their rights under federal law and the U.S. Constitution.

72.     Under the Administrative Order, Defendants have subjected, and will continue to subject, KC Tenants members to unnecessarily intrusive eviction and eviction-related evidentiary hearings for exercising their rights in violation of the Moratorium's language and intent. In doing so, Defendants have denied, and will continue to deny, KC Tenants members and other tenants with their rights under federal law and the U.S. Constitution.

73.     Under the Administrative Order, Defendants have issued, and will continue to issue, final judgments and writs of execution in eviction actions for nonpayment of rent in violation of the Moratorium's language and intent against KC Tenants members who submitted declarations.

20

In doing so, Defendants have denied, and will continue to deny, KC Tenants members and other tenants with their rights under federal law and the U.S. Constitution.

## CAUSES OF ACTION

### First Cause of Action: Federal Preemption

74. Plaintiff re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

75. The Supremacy Clause, Article VI, Section 2, of the United States Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, § 2.

76. Pursuant to the Supremacy Clause, federal law preempts state law in any area where state law conflicts or interferes with federal law or federal agency action.

77. Pursuant to statutory and regulatory authority, the CDC issued a federal agency action prohibiting evictions for nonpayment of rent against tenants who have submitted a Declaration pursuant to the Moratorium. The CDC's Moratorium broadly grants these tenants immunity from *any action* that removes or attempts to remove them from a residential property, which includes the filing of new evictions and all proceedings related to, or arising from, eviction actions.

78. The CDC's Moratorium further mandates that courts interpret and implement the moratorium in a manner as to achieve its objectives of (i) preventing further spread of COVID-19

through congregate or shared living settings or unsheltered homelessness, and (ii) supporting COVID-19 response efforts at the federal, state, and local levels.

79. Through Administrative Order No. 2020-154, Defendants have expressly permitted the very activities that the CDC's Moratorium intended to prevent, including the filing of new eviction actions and eviction-related hearings, against the very persons the CDC's Moratorium is intended to protect. Defendants also have created a new, intrusive system of "eviction-plus" proceedings, where tenants may be brought into court for invasive evidentiary hearings regarding their personal finances, tax records, potential homelessness or housing insecurity, and other sensitive information—simply for seeking to exercise their rights under the CDC's Moratorium.

80. These hearings effectively function as "eviction-plus" proceedings, because an unfavorable judgment will not only lead to the tenant's imminent eviction, but also the risk of criminal liability for perjury under federal law.

81. The Administrative Order and its implementation directly and fundamentally conflict with federal agency action and the statute and regulation that authorize it, in violation of the Supremacy Clause. Accordingly, Defendants' Order is preempted by federal law.

## Second Cause of Action: Procedural Due Process

82. Plaintiff re-alleges and incorporates by reference all of the allegations contained in the preceding paragraphs of this Complaint as though fully set forth herein.

83. The Fourteenth Amendment to the U.S. Constitution protects against the deprivation of life, liberty, or property, without due process of law. U.S. Const. amend. XIV, § 2. The Fourteenth Amendment's protections apply to both property and liberty interests.

84. A state-created liberty interest arises when a state imposes "substantive limitations on official discretion." *Olim v. Wakinekona*, 461 U.S. 238, 249 (1983). A statute or regulation may

22

create a liberty interest where it contains "explicitly mandatory language, *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow." *Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 463 (1989) (internal quotation marks omitted).

85.     The CDC's Moratorium recognizes the importance of maintaining tenants' interests in their leaseholds and places substantive limitations on the exercise of state and local courts' official discretion related to eviction actions for nonpayment of rent, using explicitly mandatory language in connection with substantive predicates.

86.     The CDC's Moratorium makes clear that a tenant "shall not" face eviction—i.e., *any action* to remove or *cause the removal of a tenant* from a residential property— if they submit the required declaration under penalty of perjury. The Moratorium further provides that a violation of these protections may result in criminal prosecution under federal criminal statute.

87.     Plaintiff KC Tenants and its members have a state-created liberty interest in temporary immunity from any action to remove or cause the removal of a tenant from a residential property—including the filing of a new eviction action, being subject to eviction or eviction-related proceedings, or receiving a judgment leading to a tenant's eviction—that the CDC extends when the tenant has submitted a declaration under penalty of perjury claiming protection under the CDC's moratorium.

88.     The Administrative Order and its implementation deprive Plaintiff and its members of this temporary immunity from eviction actions without adequate procedural due process protections. Specifically, Defendants do not provide KC Tenants and its members with adequate notice and opportunity to be heard prior to Defendants' acceptance of eviction filings in violation of the Moratorium's language and purpose. Defendants also fail to provide KC Tenants and its

23

members with adequate notice and opportunity to be heard prior to and during evidentiary hearings regarding the contents of their Declarations.

**RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief authorized by 42 U.S.C. § 1983 and as a federal court of equity:

a) Enter a declaratory judgment that Administrative Order No. 2020-154 and its implementation by Defendants violates the Supremacy Clause and Fourteenth Amendment to the United States Constitution as well as federal law;

b) Issue preliminary and permanent injunctions prohibiting violation of the CDC's nationwide eviction moratorium or Plaintiff's right to due process;

c) Awarding attorneys' fees and costs to Plaintiff, and

d) Entering such other and further relief as is proper under the circumstances.

Date: September 30, 2020

Respectfully submitted,

/s/ Anthony E. Rothert
Anthony Rothert, #44827
ACLU OF MISSOURI FOUNDATION
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Telephone: (314) 652-3114
Facsimile: (314) 652-3112
arothert@aclu-mo.org

Sandra S. Park (pro hac vice forthcoming)
Linda S. Morris (pro hac vice forthcoming)
ACLU Women's Rights Project
125 Broad St. 18th Floor
New York, NY 10004
(212) 519-7871
spark@aclu.org
lindam@aclu.org