**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**Centers for Disease Control and Prevention**

**Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19**

**AGENCY:** Centers for Disease Control and Prevention (CDC), Department of Health and Human Services (HHS).

**ACTION:** Agency Order.

**SUMMARY:** The Centers for Disease Control and Prevention (CDC), located within the Department of Health and Human Services (HHS) announces the issuance of an Order under Section 361 of the Public Health Service Act to temporarily halt residential evictions to prevent the further spread of COVID–19.

**DATES:** This Order is effective September 4, 2020 through December 31, 2020.

**FOR FURTHER INFORMATION CONTACT:** Nina Witkofsky, Acting Chief of Staff, Centers for Disease Control and Prevention, 1600 Clifton Road NE, MS H21–10, Atlanta, GA 30329; Telephone: 404–639–7000; Email: *cdcregulations@cdc.gov.*

**SUPPLEMENTARY INFORMATION:**

**Background**

There is currently a pandemic of a respiratory disease (''COVID–19'') caused by a novel coronavirus (SARS–COV–2) that has now spread globally, including cases reported in all fifty states within the United States plus the District of Columbia and U.S. territories (excepting American Samoa). As of August 24, 2020, there were over 23,000,000 cases of COVID–19 globally resulting in over 800,000 deaths; over 5,500,000 cases have been identified in the United States, with new cases being reported daily and over 174,000 deaths due to the disease.

The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Some people without symptoms may be able to spread the virus. Among adults, the risk for severe illness from COVID–19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID–19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain underlying medical conditions, such as cancer, an immunocompromised state, obesity, serious heart conditions, and diabetes, are at increased risk for severe illness from COVID–19.[1]

COVID–19 presents a historic threat to public health. According to one recent study, the mortality associated with COVID–19 during the early phase of the outbreak in New York City was comparable to the peak mortality observed during the 1918 H1N1 influenza pandemic.[2] During the 1918 H1N1 influenza pandemic, there were approximately 50 million influenza-related deaths worldwide, including 675,000 in the United States. To respond to this public health threat, the Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria. Despite these best efforts, COVID–19 continues to spread and further action is needed.

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID–19 due to an underlying medical condition. They also allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID–19. Furthermore, housing stability helps protect public health because homelessness increases the likelihood of individuals moving into congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID–19. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase. Unsheltered homelessness also increases the risk that individuals will experience severe illness from COVID–19.

**Applicability**

Under this Order, a landlord, owner of a residential property, or other person [3] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order. This Order does not apply in any State, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order. Nor does this order apply to American Samoa, which has reported no cases of COVID–19, until such time as cases are reported.

In accordance with 42 U.S.C. 264(e), this Order does not preclude State, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

This Order is a temporary eviction moratorium to prevent the further spread of COVID–19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

**Renter's or Homeowner's Declaration**

Attachment A is a Declaration form that tenants, lessees, or residents of residential properties who are covered by the CDC's order temporarily halting residential evictions to prevent the further spread of COVID–19 may use. To invoke the CDC's order these persons must provide an executed copy of the Declaration form (or a similar declaration under penalty of perjury) to their landlord, owner of the residential property where they live, or other person who has a right to have them evicted or removed from where they live. Each adult listed on the lease, rental agreement, or housing contract should likewise complete and provide a declaration. Unless the CDC order is extended, changed, or ended, the order prevents these persons from being evicted or removed from where they are living through December 31, 2020. These persons are still required to pay rent and follow all the other terms of their lease and rules of the place where they live. These persons may also still be evicted for reasons other than not paying rent or making a housing

---

[1] CDC, People with Certain Medical Conditions, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html* (accessed August 26, 2020).

[2] Faust JS, Lin Z, del Rio C. Comparison of Estimated Excess Deaths in New York City During the COVID–19 and 1918 Influenza Pandemics. *JAMA New Open.* 2020;3(8):e2017527. doi:10.1001/jamanetworkopen.2020.17527.

[3] For purposes of this Order, ''person'' includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

payment. Executed declarations should not be returned to the Federal Government.

**Centers for Disease Control and Prevention, Department of Health and Human Services**

**Order Under Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 CFR 70.2**

**Temporary Halt in Residential Evictions To Prevent the Further Spread of COVID–19**

*Summary*

Notice and Order; and subject to the limitations under ''Applicability'': Under 42 CFR 70.2, a landlord, owner of a residential property, or other person [4] with a legal right to pursue eviction or possessory action, shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period of the Order.

*Definitions*

''Available government assistance'' means any governmental rental or housing payment benefits available to the individual or any household member.

''Available housing'' means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate Federal, State, or local occupancy standards and that would not result in an overall increase of housing cost to such individual.

''Covered person'' [5] means any tenant, lessee, or resident of a residential property who provides to their landlord, the owner of the residential property, or other person with a legal right to pursue eviction or a possessory action, a declaration under penalty of perjury indicating that:

(1) The individual has used best efforts to obtain all available government assistance for rent or housing;

(2) The individual either (i) expects to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return),[6] (ii) was not required to report any income in 2019 to the U.S. Internal Revenue Service, or (iii) received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;

(3) the individual is unable to pay the full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, a lay-off, or extraordinary [7] out-of-pocket medical expenses;

(4) the individual is using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses; and

(5) eviction would likely render the individual homeless—or force the individual to move into and live in close quarters in a new congregate or shared living setting—because the individual has no other available housing options.

''Evict'' and ''Eviction'' means any action by a landlord, owner of a residential property, or other person with a legal right to pursue eviction or a possessory action, to remove or cause the removal of a covered person from a residential property. This does not include foreclosure on a home mortgage.

''Residential property'' means any property leased for residential purposes, including any house, building, mobile home or land in a mobile home park, or similar dwelling leased for residential purposes, but shall not include any hotel, motel, or other guest house rented to a temporary guest or seasonal tenant as defined under the laws of the State, territorial, tribal, or local jurisdiction.

''State'' shall have the same definition as under 42 CFR 70.1, meaning ''any of the 50 states, plus the District of Columbia.''

''U.S. territory'' shall have the same definition as under 42 CFR 70.1, meaning ''any territory (also known as possessions) of the United States, including American Samoa, Guam, the Northern Mariana Islands, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands.''

*Statement of Intent*

This Order shall be interpreted and implemented in a manner as to achieve the following objectives:

• Mitigating the spread of COVID–19 within congregate or shared living settings, or through unsheltered homelessness;

• mitigating the further spread of COVID–19 from one U.S. State or U.S. territory into any other U.S. State or U.S. territory; and

• supporting response efforts to COVID–19 at the Federal, State, local, territorial, and tribal levels.

*Background*

There is currently a pandemic of a respiratory disease (''COVID–19'') caused by a novel coronavirus (SARS–COV–2) that has now spread globally, including cases reported in all fifty states within the United States plus the District of Columbia and U.S. territories (excepting American Samoa). As of August 24, 2020, there were over 23,000,000 cases of COVID–19 globally resulting in over 800,000 deaths; over 5,500,000 cases have been identified in the United States, with new cases being reported daily and over 174,000 deaths due to the disease.

The virus that causes COVID–19 spreads very easily and sustainably between people who are in close contact with one another (within about 6 feet), mainly through respiratory droplets produced when an infected person coughs, sneezes, or talks. Some people without symptoms may be able to spread the virus. Among adults, the risk for severe illness from COVID–19 increases with age, with older adults at highest risk. Severe illness means that persons with COVID–19 may require hospitalization, intensive care, or a ventilator to help them breathe, and may be fatal. People of any age with certain underlying medical conditions, such as cancer, an

---

[4] For purposes of this Order, ''person'' includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

[5] This definition is based on factors that are known to contribute to evictions and thus increase the need for individuals to move into close quarters in new congregate or shared living arrangements or experience homelessness. Individuals who suffer job loss, have limited financial resources, are low income, or have high out-of-pocket medical expenses are more likely to be evicted for nonpayment of rent than others not experiencing these factors. *See* Desmond, M., Gershenson, C., *Who gets evicted? Assessing individual, neighborhood, and network factors,* Social Science Research 62 (2017), 366–377, *http://dx.doi.org/10.1016/j.ssresearch.2016.08.017,* (identifying job loss as a possible predictor of eviction because renters who lose their jobs experience not only a sudden loss of income but also the loss of predictable future income). According to one survey, over one quarter (26%) of respondents also identified job loss as the primary cause of homelessness. *See* 2019 San Francisco Homeless Point-in-Time Count & Survey, page 22, available at: *https://hsh.sfgov.org/wp-content/uploads/2020/01/2019HIRDReport_SanFrancisco_FinalDraft-1.pdf.*

[6] According to one study, the national two-bedroom housing wage in 2020 was $23.96 per hour (approximately, $49,837 annually), meaning that an hourly wage of $23.96 was needed to afford a modest two bedroom house without spending more than 30% of one's income on rent. The hourly wage needed in Hawaii (the highest cost U.S. State for rent) was $38.76 (approximately $80,621 annually). *See* National Low-Income Housing Coalition, *Out of Reach: The High Cost of Housing 2020,* available at: *https://reports.nlihc.org/oor.* As further explained herein, because this Order is intended to serve the critical public health goal of preventing evicted individuals from potentially contributing to the interstate spread of COVID–19 through movement into close quarters in new congregate, shared housing settings, or though homelessness, the higher income thresholds listed here have been determined to better serve this goal.

[7] An extraordinary medical expense is any unreimbursed medical expense likely to exceed 7.5% of one's adjusted gross income for the year.

immunocompromised state, obesity, serious heart conditions, and diabetes, are at increased risk for severe illness from COVID–19.[8]

COVID–19 presents a historic threat to public health. According to one recent study, the mortality associated with COVID–19 during the early phase of the outbreak in New York City was comparable to the peak mortality observed during the 1918 H1N1 influenza pandemic.[9] During the 1918 H1N1 influenza pandemic, there were approximately 50 million influenza-related deaths worldwide, including 675,000 in the United States. To respond to this public health threat, the Federal, State, and local governments have taken unprecedented or exceedingly rare actions, including border closures, restrictions on travel, stay-at-home orders, mask requirements, and eviction moratoria. Despite these significant efforts, COVID–19 continues to spread and further action is needed.

In the context of a pandemic, eviction moratoria—like quarantine, isolation, and social distancing—can be an effective public health measure utilized to prevent the spread of communicable disease. Eviction moratoria facilitate self-isolation by people who become ill or who are at risk for severe illness from COVID–19 due to an underlying medical condition. They also allow State and local authorities to more easily implement stay-at-home and social distancing directives to mitigate the community spread of COVID–19. Furthermore, housing stability helps protect public health because homelessness increases the likelihood of individuals moving into close quarters in congregate settings, such as homeless shelters, which then puts individuals at higher risk to COVID–19.

*Applicability*

This Order does not apply in any State, local, territorial, or tribal area with a moratorium on residential evictions that provides the same or greater level of public-health protection than the requirements listed in this Order. In accordance with 42 U.S.C. 264(e), this Order does not preclude State, local, territorial, and tribal authorities from imposing additional requirements that provide greater public-health protection and are more restrictive than the requirements in this Order.

Additionally, this Order shall not apply to American Samoa, which has reported no cases of COVID–19, until such time as cases are reported.

This Order is a temporary eviction moratorium to prevent the further spread of COVID–19. This Order does not relieve any individual of any obligation to pay rent, make a housing payment, or comply with any other obligation that the individual may have under a tenancy, lease, or similar contract. Nothing in this Order precludes the charging or collecting of fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

Nothing in this Order precludes evictions based on a tenant, lessee, or resident: (1) Engaging in criminal activity while on the premises; (2) threatening the health or safety of other residents;[10] (3) damaging or posing an immediate and significant risk of damage to property; (4) violating any applicable building code, health ordinance, or similar regulation relating to health and safety; or (5) violating any other contractual obligation, other than the timely payment of rent or similar housing-related payment (including non-payment or late payment of fees, penalties, or interest).

Eviction and Risk of COVID–19 Transmission

Evicted renters must move, which leads to multiple outcomes that increase the risk of COVID–19 spread. Specifically, many evicted renters move into close quarters in shared housing or other congregate settings. According to the Census Bureau American Housing Survey, 32% of renters reported that they would move in with friends or family members upon eviction, which would introduce new household members and potentially increase household crowding.[11] Studies show that COVID–19 transmission occurs readily within households; household contacts are estimated to be 6 times more likely to become infected by an index case of COVID–19 than other close contacts.[12]

Shared housing is not limited to friends and family. It includes a broad range of settings, including transitional housing, and domestic violence and abuse shelters. Special considerations exist for such housing because of the challenges of maintaining social distance. Residents often gather closely or use shared equipment, such as kitchen appliances, laundry facilities, stairwells, and elevators. Residents may have unique needs, such as disabilities, cognitive decline, or no access to technology, and thus may find it more difficult to take actions to protect themselves from COVID–19. CDC recommends that shelters provide new residents with a clean mask, keep them isolated from others, screen for symptoms at entry, or arrange for medical evaluations as needed depending on symptoms.[13] Accordingly, an influx of new residents at facilities that offer support services could potentially overwhelm staff and, if recommendations are not followed, lead to exposures.

Congress passed the Coronavirus Aid, Relief, and Economic Security (CARES) Act (Pub. L. 116–136) to aid individuals and businesses adversely affected by COVID–19. Section 4024 of the CARES Act provided a 120-day moratorium on eviction filings as well as other protections for tenants in certain rental properties with Federal assistance or federally related financing. These protections helped alleviate the public health consequences of tenant displacement during the COVID–19 pandemic. The CARES Act eviction moratorium expired on July 24, 2020.[14] The protections in the CARES Act supplemented temporary eviction moratoria and rent freezes implemented by governors and local officials using emergency powers.

Researchers estimated that this temporary Federal moratorium provided relief to a material portion of the nation's roughly 43 million renters.[15]

---

[8] CDC, People with Certain Medical Conditions, *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html* (accessed August 26, 2020).

[9] Faust JS, Lin Z, del Rio C. Comparison of Estimated Excess Deaths in New York City During the COVID–19 and 1918 Influenza Pandemics. *JAMA New Open.* 2020;3(8):e2017527. *doi:10.1001/jamanetworkopen.2020.17527.*

[10] Individuals who might have COVID–19 are advised to stay home except to get medical care. Accordingly, individuals who might have COVID–19 and take reasonable precautions to not spread the disease should not be evicted on the ground that they may pose a health or safety threat to other residents. See *What to Do if You are Sick,* available at *https://www.cdc.gov/coronavirus/2019-ncov/if-you-are-sick/steps-when-sick.html.*

[11] United States Census Bureau. American Housing Survey, 2017. *https://www.census.gov/programs-surveys/ahs.html.*

[12] Bi Q, Wu Y, Mei S, et al. *Epidemiology and transmission of COVID–19 in 391 cases and 1286 of their close contacts in Shenzhen, China: a retrospective cohort study.* Lancet Infect Dis 2020, *https://doi.org/10.1016/S1473-3099(20)30287-5.*

[13] *See* CDC COVID–19 Guidance for Shared or Congregate Housing, available at: *https://www.cdc.gov/coronavirus/2019-ncov/community/shared-congregate-house/guidance-shared-congregate-housing.html.*

[14] Because evictions generally require 30-days' notice, the effects of housing displacement due to the expiration of the CARES act are not expected to manifest until August 27, 2020.

[15] See Congressional Research Service, *CARES Act Eviction Moratorium,* (April 7, 2020) available at: *https://crsreports.congress.gov/product/pdf/IN/IN11320.*

Approximately 12.3 million rental units have federally backed financing, representing 28% of renters. Other data show more than 2 million housing vouchers along with approximately 2 million other federally assisted rental units.[16]

The Federal moratorium, however, did not reach all renters. Many renters who fell outside the scope of the Federal moratorium were protected under State and local moratoria. In the absence of State and local protections, as many as 30–40 million people in America could be at risk of eviction.[17] A wave of evictions on that scale would be unprecedented in modern times.[18] A large portion of those who are evicted may move into close quarters in shared housing or, as discussed below, become homeless, thus contributing to the spread of COVID–19.

The statistics on interstate moves show that mass evictions would likely increase the interstate spread of COVID–19. Over 35 million Americans, representing approximately 10% of the U.S. population, move each year.[19] Approximately 15% of moves are interstate.[20]

Eviction, Homelessness, and Risk of Severe Disease From COVID–19

Evicted individuals without access to housing or assistance options may also contribute to the homeless population, including older adults or those with underlying medical conditions, who are more at risk for severe illness from COVID–19 than the general population.[21] In Seattle-King County, 5–15% of people experiencing homelessness between 2018 and 2020 cited eviction as the primary reason for becoming homeless.[22] Additionally, some individuals and families who are evicted may originally stay with family or friends, but subsequently seek homeless services. Among people who entered shelters throughout the United States in 2017, 27% were staying with family or friends beforehand.[23]

People experiencing homelessness are a high-risk population. It may be more difficult for these persons to consistently access the necessary resources in order to adhere to public health recommendations to prevent COVID–19. For instance, it may not be possible to avoid certain congregate settings such as homeless shelters, or easily access facilities to engage in handwashing with soap and water.

Extensive outbreaks of COVID–19 have been identified in homeless shelters.[24] In Seattle, Washington, a network of three related homeless shelters experienced an outbreak that led to 43 cases among residents and staff members.[25] In Boston, Massachusetts, universal COVID–19 testing at a single shelter revealed 147 cases, representing 36% of shelter residents.[26] COVID–19 testing in a single shelter in San Francisco led to the identification of 101 cases (67% of those tested).[27] Throughout the United States, among 208 shelters reporting universal diagnostic testing data, 9% of shelter clients have tested positive.[28]

CDC guidance recommends increasing physical distance between beds in homeless shelters.[29] To adhere to this guidance, shelters have limited the number of people served throughout the United States. In many places, considerably fewer beds are available to individuals who become homeless. Shelters that do not adhere to the guidance, and operate at ordinary or increased occupancy, are at greater risk for the types of outbreaks described above. The challenge of mitigating disease transmission in homeless shelters has been compounded because some organizations have chosen to stop or limit volunteer access and participation.

In the context of the current pandemic, large increases in evictions could have at least two potential negative consequences. One is if homeless shelters increase occupancy in ways that increase the exposure risk to COVID–19. The other is if homeless shelters turn away the recently homeless, who could become unsheltered, and further contribute to the spread of COVID–19. Neither consequence is in the interest of the public health.

The risk of COVID–19 spread associated with unsheltered homelessness (those who are sleeping outside or in places not meant for human habitation) is of great concern to CDC. Over 35% of homeless persons are typically unsheltered.[30] The unsheltered homeless are at higher risk for infection when there is community spread of COVID–19. The risks associated with sleeping and living outdoors or in an encampment setting are different than from staying indoors in a congregate setting, such as an emergency shelter or other congregate living facility. While outdoor settings may allow people to increase physical distance between themselves and others, they may also involve exposure to the elements and inadequate access to hygiene, sanitation facilities, health care, and therapeutics. The latter factors contribute to the further spread of COVID–19.

Additionally, research suggests that the population of persons who would be evicted and become homeless would include many who are predisposed to developing severe disease from COVID–19. Five studies have shown an association between eviction and hypertension, which has been associated with more severe outcomes from COVID–19.[31] Also, the homeless

---

[16] See HUD, A Picture of Subsidized Households General Description of the Data and Bibliography, available at: *https://www.huduser.gov/portal/datasets/assthsg/statedata98/descript.html.*

[17] See Emily Benfer, et al., *The COVID–19 Eviction Crisis: An Estimated 30–40 Million People in America are at Risk,* available at: *https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/.*

[18] As a baseline, approximately 900,000 renters are evicted every year in the United States. Princeton University Eviction Lab. National Estimates: Eviction in America. *https://evictionlab.org/national-estimates/.*

[19] See U.S. Census Bureau, CPS Historical Migration/Geographic Mobility Tables, available at: *https://www.census.gov/data/tables/time-series/demo/geographic-mobility/historic.html.*

[20] *Id.*

[21] See CDC, Coronavirus Disease 2019 (COVID–19), People Who Are at Increased Risk for Severe Illness, available at *https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html* (accessed August 26, 2020).

[22] Seattle-King County. Point in Time Count. *https://regionalhomelesssystem.org/wp-content/uploads/2020/07/Count-Us-In-2020-Final_7.29.2020.pdf*

[23] United States Department of Housing and Urban Development. The 2017 Annual Homeless Assessment Report (AHAR) to Congress: Part 2. Available at: *https://files.hudexchange.info/resources/documents/2017-AHAR-Part-2.pdf*

[24] Mosites E, et al, *Assessment of SARS-CoV–2 Infection Prevalence in Homeless Shelters—Four U.S. Cities, March 27–April 15, 2020.* MMWR 2020 May 1;69(17):521–522.

[25] Tobolowsky FA, et al. *COVID–19 Outbreak Among Three Affiliated Homeless Service Sites—King County, Washington, 2020.* MMWR 2020 May 1;69(17):523–526.

[26] Baggett TP, Keyes H, Sporn N, Gaeta JM. *Prevalence of SARS-CoV–2 Infection in Residents of a Large Homeless Shelter in Boston.* JAMA. 2020 Apr 27;323(21):2191–2. Online ahead of print.

[27] Imbert E, et al. *Coronavirus Disease 2019 (COVID–19) Outbreak in a San Francisco Homeless Shelter.* Clin Infect Dis. 2020 Aug 3.

[28] National Health Care for the Homeless Council and Centers for Disease Control and Prevention. Universal Testing Data Dashboard. Available at: *https://nhchc.org/cdc-covid-dashboard/.*

[29] Centers for Disease Control and Prevention. Interim Guidance for Homeless Service Providers to Plan and Respond to COVID–19. *https://www.cdc.gov/coronavirus/2019-ncov/community/homeless-shelters/plan-prepare-respond.html.*

[30] In January 2018, 552,830 people were counted as homeless in the United States. Of those, 194,467 (35 percent) were unsheltered, and 358,363 (65 percent) were sheltered. *See,* Council of Economic Advisors, *The State of Homelessness in America* (September 2019), available at *https://www.whitehouse.gov/wp-content/uploads/2019/09/The-State-of-Homelessness-in-America.pdf.*

[31] Hugo Vasquez-Vera, et al. *The threat of home eviction and its effects on health through the equity*
Continued

often have underlying conditions that increase their risk of severe outcomes of COVID–19.[32] Among patients with COVID–19, homelessness has been associated with increased likelihood of hospitalization.[33]

These public health risks may increase seasonally. Each year, as winter approaches and the temperature drops, many homeless move into shelters to escape the cold and the occupancy of shelters increases.[34] At the same time, there is evidence to suggest that the homeless are more susceptible to respiratory tract infections,[35] which may include seasonal influenza. While there are differences in the epidemiology of COVID–19 and seasonal influenza, the potential co-circulation of viruses during periods of increased occupancy in shelters could increase the risk to occupants in those shelters.

In short, evictions threaten to increase the spread of COVID–19 as they force people to move, often into close quarters in new shared housing settings with friends or family, or congregate settings such as homeless shelters. The ability of these settings to adhere to best practices, such as social distancing and other infection control measures, decreases as populations increase. Unsheltered homelessness also increases the risk that individuals will experience severe illness from COVID–19.

*Findings and Action*

Therefore, I have determined the temporary halt in evictions in this Order constitutes a reasonably necessary measure under 42 CFR 70.2 to prevent the further spread of COVID–19 throughout the United States. I have further determined that measures by states, localities, or U.S. territories that do not meet or exceed these minimum protections are insufficient to prevent the interstate spread of COVID–19.[36]

Based on the convergence of COVID–19, seasonal influenza, and the increased risk of individuals sheltering in close quarters in congregate settings such as homeless shelters, which may be unable to provide adequate social distancing as populations increase, all of which may be exacerbated as fall and winter approach, I have determined that a temporary halt on evictions through December 31, 2020, subject to further extension, modification, or rescission, is appropriate.

Therefore, under 42 CFR 70.2, subject to the limitations under the ''Applicability'' section, a landlord, owner of a residential property, or other person with a legal right to pursue eviction or possessory action shall not evict any covered person from any residential property in any State or U.S. territory in which there are documented cases of COVID–19 that provides a level of public-health protections below the requirements listed in this Order.

This Order is not a rule within the meaning of the Administrative Procedure Act (''APA'') but rather an emergency action taken under the existing authority of 42 CFR 70.2. In the event that this Order qualifies as a rule under the APA, notice and comment and a delay in effective date are not required because there is good cause to dispense with prior public notice and comment and the opportunity to comment on this Order and the delay in effective date. *See* 5 U.S.C. 553(b)(3)(B). Considering the public-health emergency caused by COVID–19, it would be impracticable and contrary to the public health, and by extension the public interest, to delay the issuance and effective date of this Order.

A delay in the effective date of the Order would permit the occurrence of evictions—potentially on a mass scale—that could have potentially significant consequences. As discussed above, one potential consequence would be that evicted individuals would move into close quarters in congregate or shared living settings, including homeless shelters, which would put the individuals at higher risk to COVID–19. Another potential consequence would be if evicted individuals become homeless and unsheltered, and further contribute to the spread of COVID–19. A delay in the effective date of the Order that leads to such consequences would defeat the purpose of the Order and endanger the public health. Immediate action is necessary.

Similarly, if this Order qualifies as a rule under the APA, the Office of Information and Regulatory Affairs has determined that it would be a major rule under the Congressional Review Act (CRA). But there would not be a delay in its effective date. The agency has determined that for the same reasons, there would be good cause under the CRA to make the requirements herein effective immediately.

If any provision of this Order, or the application of any provision to any persons, entities, or circumstances, shall be held invalid, the remainder of the provisions, or the application of such provisions to any persons, entities, or circumstances other than those to which it is held invalid, shall remain valid and in effect.

This Order shall be enforced by Federal authorities and cooperating State and local authorities through the provisions of 18 U.S.C. 3559, 3571; 42 U.S.C. 243, 268, 271; and 42 CFR 70.18. However, this Order has no effect on the contractual obligations of renters to pay rent and shall not preclude charging or collecting fees, penalties, or interest as a result of the failure to pay rent or other housing payment on a timely basis, under the terms of any applicable contract.

*Criminal Penalties*

Under 18 U.S.C. 3559, 3571; 42 U.S.C. 271; and 42 CFR 70.18, a person violating this Order may be subject to a fine of no more than $100,000 if the violation does not result in a death or one year in jail, or both, or a fine of no more than $250,000 if the violation results in a death or one year in jail, or both, or as otherwise provided by law. An organization violating this Order may be subject to a fine of no more than $200,000 per event if the violation does not result in a death or $500,000 per event if the violation results in a death or as otherwise provided by law. The U.S. Department of Justice may initiate court proceedings as appropriate seeking imposition of these criminal penalties.

*Notice to Cooperating State and Local Officials*

Under 42 U.S.C. 243, the U.S. Department of Health and Human Services is authorized to cooperate with and aid State and local authorities in the enforcement of their quarantine and

---

[32] Fazel S, Geddes JR, Kushel M. *The health of homeless people in high-income countries: descriptive epidemiology, health consequences, and clinical and policy recommendations.* Lancet. 2014;384(9953):1529–1540.

[33] Hsu HE, et al. *Race/Ethnicity, Underlying Medical Conditions, Homelessness, and Hospitalization Status of Adult Patients with COVID–19 at an Urban Safety-Net Medical Center—Boston, Massachusetts, 2020.* MMWR 2020 Jul 10;69(27):864–869. Historically, African Americans and Hispanic Americans are disproportionately represented in evictions compared to other races. They are more likely to experience severe outcomes of COVID–19. *Id.*

[34] *See,* generally, the Annual Homeless Assessment Report to Congress (2007), available at: *https://www.huduser.gov/Publications/pdf/ahar.pdf* (acknowledging the seasonality of shelter bed use).

[35] Ly TDA, Edouard S, Badiaga S, et al. Epidemiology of respiratory pathogen carriage in the homeless population within two shelters in Marseille, France, 2015–2017: Cross sectional 1-day surveys. Clin Microbiol Infect. 2019; 25(2):249.e1–249.e6.

[36] In the United States, public health measures are implemented at all levels of government, including the Federal, State, local, and tribal levels. Publicly-available compilations of pending measures indicate that eviction moratoria and other protections from eviction have expired or are set to expire in many jurisdictions. Eviction Lab, *COVID–19 Housing Policy Scorecard,* available at: *https://evictionlab.org/covid-policy-scorecard/*.

other health regulations and to accept State and local assistance in the enforcement of Federal quarantine rules and regulations, including in the enforcement of this Order.

*Notice of Available Federal Resources*

While this order to prevent eviction is effectuated to protect the public health, the States and units of local government are reminded that the Federal Government has deployed unprecedented resources to address the pandemic, including housing assistance.

The Department of Housing and Urban Development (HUD) has informed CDC that all HUD grantees—states, cities, communities, and nonprofits—who received Emergency Solutions Grants (ESG) or Community Development Block Grant (CDBG) funds under the CARES Act may use these funds to provide temporary rental assistance, homelessness prevention, or other aid to individuals who are experiencing financial hardship because of the pandemic and are at risk of being evicted, consistent with applicable laws, regulations, and guidance.

HUD has further informed CDC that:

HUD's grantees and partners play a critical role in prioritizing efforts to support this goal. As grantees decide how to deploy CDBG–CV and ESG–CV funds provided by the CARES Act, all communities should assess what resources have already been allocated to prevent evictions and homelessness through temporary rental assistance and homelessness prevention, particularly to the most vulnerable households.

HUD stands at the ready to support American communities take these steps to reduce the spread of COVID–19 and maintain economic prosperity. Where gaps are identified, grantees should coordinate across available Federal, non-Federal, and philanthropic funds to ensure these critical needs are sufficiently addressed, and utilize HUD's technical assistance to design and implement programs to support a coordinated response to eviction prevention needs. For program support, including technical assistance, please visit *www.hudexchange.info/program-support.* For further information on HUD resources, tools, and guidance available to respond to the COVID–19 pandemic, State and local officials are directed to visit *https://www.hud.gov/coronavirus.* These tools include toolkits for Public Housing Authorities and Housing Choice Voucher landlords related to housing stability and eviction prevention, as well as similar guidance for owners and renters in HUD-assisted multifamily properties.

Similarly, the Department of the Treasury has informed CDC that the funds allocated through the Coronavirus Relief Fund may be used to fund rental assistance programs to prevent eviction. Visit *https://home.treasury.gov/policy-issues/cares/state-and-local-governments* for more information.

*Effective Date*

This Order is effective upon publication in the **Federal Register** and will remain in effect, unless extended, modified, or rescinded, through December 31, 2020.

**Attachment**

**Declaration Under Penalty of Perjury for the Centers for Disease Control and Prevention's Temporary Halt in Evictions to Prevent Further Spread of COVID–19**

This declaration is for tenants, lessees, or residents of residential properties who are covered by the CDC's order temporarily halting residential evictions (not including foreclosures on home mortgages) to prevent the further spread of COVID–19. Under the CDC's order you must provide a copy of this declaration to your landlord, owner of the residential property where you live, or other person who has a right to have you evicted or removed from where you live. Each adult listed on the lease, rental agreement, or housing contract should complete this declaration. Unless the CDC order is extended, changed, or ended, the order prevents you from being evicted or removed from where you are living through December 31, 2020. You are still required to pay rent and follow all the other terms of your lease and rules of the place where you live. You may also still be evicted for reasons other than not paying rent or making a housing payment. This declaration is sworn testimony, meaning that you can be prosecuted, go to jail, or pay a fine if you lie, mislead, or omit important information.

I certify under penalty of perjury, pursuant to 28 U.S.C. 1746, that the foregoing are true and correct:

• I have used best efforts to obtain all available government assistance for rent or housing;[37]

• I either expect to earn no more than $99,000 in annual income for Calendar Year 2020 (or no more than $198,000 if filing a joint tax return), was not required to report any income in 2019 to the U.S. Internal Revenue Service, or received an Economic Impact Payment (stimulus check) pursuant to Section 2201 of the CARES Act;

• I am unable to pay my full rent or make a full housing payment due to substantial loss of household income, loss of compensable hours of work or wages, lay-offs, or extraordinary[38] out-of-pocket medical expenses;

• I am using best efforts to make timely partial payments that are as close to the full payment as the individual's circumstances may permit, taking into account other nondiscretionary expenses;

• If evicted I would likely become homeless, need to move into a homeless shelter, or need to move into a new residence shared by other people who live in close quarters because I have no other available housing options.[39]

• I understand that I must still pay rent or make a housing payment, and comply with other obligations that I may have under my tenancy, lease agreement, or similar contract. I further understand that fees, penalties, or interest for not paying rent or making a housing payment on time as required by my tenancy, lease agreement, or similar contract may still be charged or collected.

• I further understand that at the end of this temporary halt on evictions on December 31, 2020, my housing provider may require payment in full for all payments not made prior to and during the temporary halt and failure to pay may make me subject to eviction pursuant to State and local laws.

I understand that any false or misleading statements or omissions may result in criminal and civil actions for fines, penalties, damages, or imprisonment.

———
Signature of Declarant Date

———

**Authority**

The authority for this Order is Section 361 of the Public Health Service Act (42 U.S.C. 264) and 42 CFR 70.2.

Dated: September 1, 2020.

**Nina B. Witkofsky,**

*Acting Chief of Staff, Centers for Disease Control and Prevention.*

[FR Doc. 2020–19654 Filed 9–1–20; 4:15 pm]

**BILLING CODE 4163–18–P**

---

[37] "Available government assistance" means any governmental rental or housing payment benefits available to the individual or any household member.

[38] An "extraordinary" medical expense is any unreimbursed medical expense likely to exceed 7.5% of one's adjusted gross income for the year.

[39] "Available housing" means any available, unoccupied residential property, or other space for occupancy in any seasonal or temporary housing, that would not violate Federal, State, or local occupancy standards and that would not result in an overall increase of housing cost to you.