IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| KC Tenants,<br><br>    Plaintiff,<br><br>v.<br><br>David M. Byrn, et al.,<br><br>    Defendants. | Case No. 20-000784-CV-W-HFS |

**BRIEF OF AMICI CURIAE LEGAL AID OF WESTERN MISSOURI, LEGAL SERVICES OF EASTERN MISSOURI, AND NATIONAL HOUSING LAW PROJECT IN SUPPORT OF PRELIMINARY INJUNCTIVE RELIEF**

# TABLE OF CONTENTS

Table of Authorities ………………………………………………………………………..…….. i

Corporate Disclosure Statements and Certifications ………………………………....………..… iii

I. Introduction ………………………………………………………………………………………… 1

II. Identify & Interest of Amici Curiae …………………………………………………………….. 2

III. Argument ……………………………………………………………………………….………… 3

  A. The CDC order prohibits landlords from taking any action to remove or cause the removal of a covered tenant prior to December 31, 2020 ………………………. 3

    1. Allowing landlords to file and prosecute eviction cases against covered tenants conflicts with the plain meaning of the CDC halt order ……….…… 4

    2. CDC halt order denies landlords immediate right to possession of premises occupied by covered tenants ……………………………………... 5

  B. Allowing landlords to file and prosecute eviction lawsuits against covered tenants is harmful to tenants and contrary to public health objectives. ……….…… 7

    1. Allowing eviction notices and lawsuits harms covered tenants ……………. 7

    2. Allowing eviction lawsuits undermines public health goals ……………….. 8

  C. Allowing landlords an unrestricted ability to challenge tenant declarations undermines the CDC halt order and invites abuse and intimidation of tenants …… 10

  D. The disproportionate racial impacts of both evictions and Covid-19 threaten especially devastating outcomes on communities of color …………………….... 12

IV. Conclusion ……………………………………………………………………………………. 14

# TABLE OF AUTHORITIES

**Cases**

*Addington v. Texas,* 441 U.S. 418 (1979) ………………………………………………………… 11

*Boyd v. Boon Mgmt., Inc.*, 976 S.W.2d 24 (Mo. App. 1984) …………………………………….. 4

*B-W Acceptance Corp. v. Benack,* 423 S.W.2d 215 (Mo. App. 1967) ………………………….. 6

i

*Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142 (2012) ………………………….… 5

*Davidson v. Kenney*, 971 S.W.2d 896 (Mo. App. 1998) ……………………………………....… 6

*Delaware* v. *Franks,* 438 U.S. 154 (1978) …………………………………………………….... 12

*Fisher v. Payton*, 219 S.W.2d 293 (1949) …………………………………………………….. 6

*Gordon v. Williams*, 986 S.W.2d 470 (Mo. App. 1998) ……………………………………… 6

*Grant v. White,* 42 Mo. 285 (1868) ……………………………………………………………… 5

*Kisor v. Wilkie,* _ U.S. _, 139 S.Ct. 2400 (2019) …………………………………………....… 4-5

*Lake in the Woods Apts. v. Carson,* 651 S.W.2d 556 (Mo. App. 1983) ………………………… 6

*Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158 (2007) …………………………………… 5

*McIlvain v. Kavorinos*, 236 S.W.2d 322 (Mo. 1951) ……………………………………………… 6

*Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306 (1950) ………………………………… 8

*N.L.R.B. v. North Dakota,* 504 F.Supp.2d 750 (D.N.D. 2007) ……………………………...… 7

*Robinson v. Shell Oil Co.,* 519 U.S. 337 (1997) ……………………………………………….... 4

*Solis v. Summit Contractors, Inc.,* 558 F.3d 815 (8th Cir. 2009) ………………………….…… 4

**Statutes**

R.S.Mo. § 534.030 …………………………………………………………………………….. 5

R.S.Mo. § 534.330 ……………………………………………………………………………. 7

R.S.Mo. § 535.010 …………………………………………………………………………….. 5-6

R.S.Mo. § 535.120 ……………………………………………………………………………. 6

42 U.S.C. § 3601 …………………………………………………………………………….. 14

**Regulatory Material**

CDC Halt Order, 85 Fed.Reg. 55292 (Sept. 4, 2020) ……………………………… 1, 4, 6-10, 14

CDC Halt Order FAQ ……………………………………………………………………… 4

**Other Authorities**

36A C.J.S., Forcible Entry & Detainer, § 7 (Sept. 2020) ……………………………………….. 5

Jefferson County Administrative Order 2020-154 …………...……………... 2, 4, 6, 8- 10, 12, 14

18 Mo. Prac., Real Estate Law-Transact, & Disputes, 3d Ed. § 32:14 (Aug. 2020) …………...... 8

## CORPORATE DISCLOSURE STATEMENTS AND CERTIFICATIONS

Amici LAWMO, LSEM, and NHLP certify, based on R. of App. Proc. 29(a)(4)E, that:

1. Each Amicus is a nonprofit organization, none has a parent corporation, and there is no publicly held corporation that owns 10% or more of any amici's stock.

2. No party or party's counsel authored this brief in whole or in part.

3. No party or party's counsel contributed money that was intended to fund the preparation or submission of this brief.

4. No person or entity other than Amici, their staff, and their counsel contributed money that was intended to fund the preparation or submission of this brief.

**I. Introduction**

By the time the Centers for Disease Control and Prevention (CDC) ordered a nationwide "Temporary Halt in Residential Evictions to Prevent the Further Spread of COVID-19" on September 4, communities across the United States were bracing for the arrival of an eviction crisis the likes of which the country has never seen. Tens of millions of workers had endured temporary or ongoing disruptions to their incomes, and previous federal assistance measures (such as $1,200 "stimulus" checks, a $600 week boost in unemployment benefits, and a bar on certain nonpayment evictions) had run out. Millions of renters had fallen behind in rent, millions more expected to default the following month, and tens of millions lacked confidence in their ability to continue paying, and often resorting to credit cards or other unsustainable emergency funding sources. Experts predicted overwhelming numbers: 19 million or more evictions, up to 40 million people displaced--all within a matter of weeks.[1] In Missouri alone, the U.S. Census Bureau estimated over 120,000 households were behind on rent by August 31, and that 61,500 would likely be evicted within the ensuing two months[2]--more than three times the number evicting Missouri typically sees throughout an entire calendar year.[3]

Evictions on such a massive scale at any time would profoundly disrupt communities; businesses, local governments, schools, places of worship, and other institutions could hardly weather the sudden loss of so many employees, students, members, and neighbors. But mass

---

[1] See Emily Benfer et al., "The COVID-19 Eviction Crisis: an Estimated 30-40 Million People in America Are at Risk," Aspen Institute (Aug. 7, 2020), on-line at: https://www.aspeninstitute.org/blog-posts/the-covid-19-eviction-crisis-an-estimated-30-40-million-people-in-america-are-at-risk/

[2] U.S. Census Bureau, Week 13 Household Pulse Survey (Sept. 9, 2020), Housing Tables 1b, 3b, on-line at: https://www.census.gov/data/tables/2020/demo/hhp/hhp13.html

[3] See Eviction Lab, Missouri Data (2016), on-line at: https://evictionlab.org/map/#/2016?geography=states&bounds=-97.328,35.696,-87.546,40.893&type=er&locations=29,-92.434,38.305

1

evictions during a 100-year pandemic would be even more devastating: undermining the ability of those affected to practice hygiene and social distancing, and exacerbating transmission by driving persons into shared housing or homelessness. The CDC imposed its halt order in recognition of these dangers, staving off the anticipated wave of mass evictions for now.

The halt order cannot truly accomplish its public health objectives, however, if the core protection it affords against residential eviction is functionally eroded by exceptions, loopholes, and procedural traps. Jackson County Administrative Order 2020-154 ("A.O. 154"), which purports to allow landlords to file and prosecute eviction cases even against tenants covered by the halt order, and which further invites landlords to contest the contents of the form declarations intended to protect tenants, has precisely these adverse effects. A.O. 154 chills and deters tenants from invoking the halt order, and denies its full protection to those who do. The Court should ultimately declare A.O. 154 unlawful, and in the meantime should enter preliminary injunctive relief to alleviate its harmful impacts on the public health.

## II. Identity & Interest of Amici Curiae

Legal Aid of Western Missouri (LAWMO) is a nonprofit organization that provides civil legal services to a 40-county area in western Missouri—an area where 295,000 live in poverty. LAWMO's advocates provide advice and representation to tenants with issues around public housing, subsidies, and evictions—including in the 16th Judicial Circuit in Jackson County.

Legal Services of Eastern Missouri (LSEM) is a Missouri nonprofit that provides high quality civil legal assistance to low-income individuals and families, seniors, and persons with disabilities in 21 Missouri counties. Representing low-income tenants in housing matters has always been a high-priority, but LSEM has redoubled its focus on eviction defense during the coronavirus pandemic—including by hiring three new staff attorneys and dedicating social work

2

resources to pandemic-related eviction defense, apprising local judges and state and local agencies of tenant protections under new federal laws, and engaging in robust efforts to engage volunteer pro bono counsel. LSEM has also comprehensively tracked court filings and court procedures across Missouri to determine their impact on litigants' rights and safety.

The National Housing Law Project (NHLP) is a nonprofit organization that works to advance tenants' rights, increase housing opportunities for underserved communities, and preserve and expand the nation's supply of safe and affordable homes. NHLP pursues these goals primarily through technical assistance and support to legal aid attorneys and other housing advocates. NHLP coordinates the Housing Justice Network, a group of more than 1,600 legal aid and other housing advocates throughout the U.S. that has collaborated on significant housing law issues for over 40 years. Since 1981 NHLP has published *HUD Housing Programs: Tenants' Rights*; commonly known as the "Greenbook," it is seminal authority on the rights of HUD tenants and program participants. Since the beginning of the pandemic, NHLP has worked to prevent widespread evictions by advocating at the federal level and in multiple states for eviction moratoria and other housing protections and relief funding, creating resources to help tenants and advocates learn about and exercise rights and protections, supplied training to a broad array of stakeholders, and provided leadership through national workgroups, communications, and media.

**III. Argument**

The Plaintiffs are likely to prevail on the merits because A.O. 154 improperly authorizes eviction proceedings in conflict with the CDC's halt order. In the meantime, the Court should enjoin the violative provisions of A.O. 154 because those improper eviction proceedings cause significant, irreparable harms to affected tenants and undermine public health.

### A. The CDC order prohibits landlords from taking any action to remove or cause the removal of a covered tenant prior to December 31, 2020.

3

In Missouri, as in all states, to evict a residential tenant from leased premises a landlord must ordinarily bring an eviction lawsuit. *See, e.g., Boyd v. Boon Mgmt., Inc.*, 976 S.W.2d 24, 26 (Mo. App. 1984). The CDC's halt order stops such eviction suits, declaring that a landlord "shall not evict any covered person from any residential property," and defining "evict" to include "any action by a landlord … to remove or cause the removal of a covered person from a residential property." 85 Fed. Reg. at 55293. A.O. 154 conflicts with the halt order by authorizing landlords to file and prosecute eviction suits against covered tenants. A.O. 154, ¶ 4.

### 1. Allowing landlords to file and prosecute eviction cases against covered tenants conflicts with the plain meaning of the CDC halt order.

The plain meaning of an "action" to remove or cause the removal of a tenant must surely include filing and litigating an eviction lawsuit—a civil actions which, by definition, is brought "to remove or cause the removal" of the defendant. *See Solis v. Summit Contractors, Inc.,* 558 F.3d 815, 823 (8th Cir. 2009) ("our inquiry begins with the regulation's plain language. We look to see 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.'") *quoting Robinson v. Shell Oil Co.,* 519 U.S. 337, 340 (1997).

Amici recognize that CDC itself recently stated in a "non-binding guidance document" that the halt order is neither "intended to terminate or suspend the operations of any state or local court" nor to "prevent landlords from starting eviction proceedings" so long covered tenants are not physically displaced while the order remains in effect. Halt Order FAQ at 1.[4] But the Court should not adhere to that statement, which is fully at odds with the unambiguous text of the halt order. *See Kisor v. Wilkie,* _ U.S. _, 139 S.Ct. 2400, 2414 (2019) (agency interpretation of own regulation can only be entitled to deference where regulation is "genuinely ambiguous").

---

[4] https://www.cdc.gov/coronavirus/2019-ncov/downloads/eviction-moratoria-order-faqs.pdf

4

Even where regulatory text is ambiguous, deference to an agency's interpretation is not appropriate where it reflects merely a "convenient litigating position" or to "a new interpretation, whether or not introduced in litigation, that creates 'unfair surprise' to regulated parties [or] substitutes one view of a rule for another." *Kisor* at 2417-8, *citing Christopher v. SmithKline Beecham Corp.,* 567 U.S. 142, 155 (2012) and *Long Island Care at Home, Ltd. v. Coke,* 551 U.S. 158, 170 (2007). Here, the CDC statement was adopted in connection with litigation challenging the halt order in Georgia, Ohio, and Tennessee,[5] and surprisingly interprets a prohibition on "any action" to remove covered tenants as allowing some actions to remove (or cause the removal of) such tenants and restricting only the one, final act to remove them. Deference also requires that an interpretive statement invoke an agency's substantive expertise. *See Kisor* at 2414 (deference shown only to on "an agency's authoritative, expertise-based" judgment). Yet CDC is a public health agency with no discernable expertise in housing law or state eviction procedures.

### 2. CDC halt order denies landlords immediate right to possession of premises occupied by covered tenants.

In substantially every state, eviction lawsuits are proper only where the plaintiff has the immediate right to possession. *See* 36A C.J.S., Forcible Entry & Detainer, § 7 (Sept. 2020). This is especially clear in Missouri, which has two separate summary eviction procedures. The unlawful detainer statute, R.S.Mo. § 534.030, dates to 1865 and applies only where a tenant "willfully" holds over after the tenant's right to possession has ended. *See Grant v. White,* 42 Mo. 285, 290 (1868) ("If the holding over is willful, it cannot be with consent either express or implied."). The other procedure, an action for rent and possession under R.S.Mo. § 535.010, is

---

[5] The cases are *Brown v. Azar,* No. 1:20-CV-3702 (N.D.Ga.), *Tiger Lily LLC v. HUD,* No. 2:20-CV-2692 (W.D.Tenn.), and *KBW Inv. Properties LLC v. Azar,* No. 2-20-CV-4852 (S.D.Ohio).

5

proper when the tenant is delinquent in rent and the landlord "has a subsisting right by law to reenter for the nonpayment of such rent[.]" R.S.Mo. § 535.120.

Numerous cases hold that an unlawful detainer action is not proper against a tenant who is not holding over at the time the case is filed. *See, e.g., McIlvain v. Kavorinos*, 236 S.W.2d 322, 327 (Mo. 1951) ("there could be no unlawful detainer until after the notice [to vacate] was given and the time provided therein had expired."); *Fisher v. Payton*, 219 S.W.2d 293, 296 (1949) ("there can be no unlawful detention by the tenant until his estate is terminated"); *Gordon v. Williams*, 986 S.W.2d 470, 473 (Mo. App. 1998) ("There can be no unlawful detainer action until the lease has been terminated"), *citing Davidson v. Kenney*, 971 S.W.2d 896, 899 (Mo. App. 1998). The rule is the same with respect to actions for possession under R.S.Mo. § 535.010, though arguably an action for rent only could still be brought. *See B-W Acceptance Corp. v. Benack,* 423 S.W.2d 215, 217-18 (Mo. App. 1967) (trial court properly bifurcated issues of rent and possession and determined them in separate trials at different times), *but see* R.S.Mo. § 535.120 (action exists where landlord has "subsisting right by law to reenter").

The essential effect of the CDC halt order is to deny a landlord the right to possession of premises occupied by a covered person until after December 31, 2020. *See* 85 Fed.Reg. 55296. In other words, a covered tenant occupying under the halt order is not unlawfully holding over, and a landlord has no grounds for a summary eviction suit. *See, e.g., Lake in the Woods Apts. v. Carson,* 651 S.W.2d 556, 558 (Mo. App. 1983) ("The unlawful detainer statute is an exclusive and special code to which the ordinary rules and proceedings of other civil actions do not apply. The sole issue is the immediate right of possession.") (internal citations omitted). By authorizing eviction suits against covered persons before December 31, A.O. 154 impermissibly contradicts the halt order—which entitles covered tenants, not their landlords, to possession of their homes.

6

**B. Allowing landlords to file and prosecute eviction lawsuits against covered tenants is harmful to tenants and contrary to public health objectives.**

Eviction suits against covered tenants are prohibited by the halt order and improper under state law; allowing landlords to bring such actions anyway is oppressive to affected tenants and undermines the CDC's goal of reducing the spread of Covid-19.

**1. Allowing eviction notices and lawsuits harms covered tenants.**

Merely filing an eviction lawsuit drastically restricts the defendant's access to rental housing long into the future, as landlords often reject applicants who have been sued for eviction, even if the case was dismissed.[6] Even "if those who are evicted do find housing, their record of eviction means they are limited to decrepit units in unsafe neighborhoods."[7] Many tenants who receive eviction notices or otherwise anticipate being sued will move out to avoid acquiring such records, defeating the halt order's primary objective. *See* 85 Fed.Reg. at 55294 ("Evicted renters must move, which leads to multiple outcomes that increase the risk of Covid-19 spread.").

In Missouri, a tenant who unlawfully detains rental premises is liable for double rent. *See* R.S.Mo. § 534.330. Subjecting tenants who occupy under the halt order to liability for double rent or other such penalties frustrates the goals of the halt order and would be preempted. *See N.L.R.B. v. North Dakota,* 504 F.Supp.2d 750, 758 (D.N.D. 2007) (state law requiring labor unions to charge non-members the costs of grievance processing preempted "as an obstacle to the full accomplishment" of federal objective in avoiding coercion of workers to join unions).

---

[6] *See* Allyson E. Gold, No Home for Justice: How Eviction Perpetuates Health Inequity Among Low-Income and Minority Tenants, 24 Geo. J. on Poverty L. & Pol'y 59, 66 (2016) ("One of the greatest, most debilitating consequences of a record of an eviction proceeding is the inability to secure decent, affordable housing," explaining how the creation of electronic eviction record drastically impairs a person's ability to rent future housing, irrespective of case outcome).
[7] Harold J. Krent, et al., Eviction Court and A Judicial Duty of Inquiry, J. Affordable Housing & Community Dev. L., at 547, 555 (2016).

Some tenants may move out to avoid risking liability for such steep penalties. Judgments for double rent may also become a drain on governmental rental assistance funds, which the CDC halt order obliges covered tenants to pursue. *See* 85 Fed.Reg. at 55293.

While A.O. 154 authorizes judges to enter eviction judgments against covered tenants, physical executions on such judgments cannot be carried out until after the halt order expires on December 31. See A.O. 154, ¶ 1, 6. As a practical matter, this means tenants could remain in premises for weeks or even months after an eviction judgment. Within such time, tenants might enter into new leases or other agreements, need critical repairs, or otherwise say or do thing that create new facts affecting the tenant's ongoing status in the housing. *See* 18 Mo. Prac., Real Estate Law-Transact, & Disputes, 3d Ed. § 32:14 (Aug. 2020) (discussing possible ways a new tenancy can arise from a holdover scenario). Yet a tenant against whom a judgment or writ of restitution has already been entered could be physically evicted (based on the prior judgment) with no further notice or opportunity to contest removal based on the new facts—a circumstance raising serious due process concerns. *See generally Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 314 (1950) (due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections," and may differ based on "the practicalities and peculiarities of the case").

### 2. Allowing eviction lawsuits undermines public health goals.

As the CDC has made clear, "mass evictions would likely increase the interstate spread of COVID-19." 85 Fed.Reg. at 55295. Recent empirical research further supports this premise. One study compared 26 states that lifted their local eviction moratoria to another 18 that did not; after controlling for mask orders, stay-at-home orders, school closures, testing rates, and other

8

Case 4:20-cv-00784-HFS   Document 27-1   Filed 10/26/20   Page 12 of 19

factors, the researchers found lifting eviction moratoria was associated with a 1.5-times higher incidence of Covid-19 after eighteen weeks.[8] The same study found lifting eviction moratoria was associated with higher Covid-19 mortality rates as well: 1.4 times higher after seven weeks, and 2.1 times higher after eighteen weeks.[9] A separate study concluded that "evictions have a measurable impact on the spread of COVID-19, and . . . that policies to prevent evictions are an important component of epidemic control."[10] This latter study, which "use[d] a mathematical model of COVID-19 spread to predict the potential impact of evictions on the epidemic course," specifically noted that effects in places (like Missouri) that had smaller initial waves of Covid-19 infections, responded with milder public health restrictions, and saw a resurgence of cases upon relaxing those measures "could be large. We observed a ~2% increase in the population infected under an eviction rate of 0.25%/month and ~12% increase with a 2% eviction rate."[11]

Evictions contribute significantly to the spread of Covid-19 because, as CDC noted, "many evicted renters move into close quarters in shared housing or other congregate settings." *See* 85 Fed.Reg. at 55294. These processes expose both the displaced tenants and the receiving household members to new contacts and corresponding infection risks. A.O. 154 may not nullify the halt order altogether—physical evictions are still precluded. But allowing landlords to serve eviction notices will cause tenants to move. Allowing landlords to file eviction lawsuits will

---

[8] *See* Kathryn M. Leifheit et al., Expiring Eviction Moratoriums and COVID-19 Incidence and Mortality (Oct. 2020) (manuscript pending publication).
[9] *See Id.*
[10] Justin Sheen et al., Covid-19 Eviction Simulations, https://github.com/alsnhll/COVID19EvictionSimulations, last visited Oct. 22, 2020
[11] *See id.* ("This type pattern played out in many metro areas in the south and southwest, including Atlanta, Austin, Las Vegas, Louisville, Memphis, Miami, Nashville, Dallas, Phoenix, and Houston.").

cause tenants to move. Allowing landlords to prosecute eviction lawsuits to judgment will cause tenants to move. Each of those moves diminishes the public health benefits of the halt order.

### C. Allowing landlords an unrestricted ability to challenge tenant declarations undermines the CDC halt order and invites abuse and intimidation of tenants.

A.O. 154 also states that a landlord who "wishes to challenge the accuracy or veracity of any statements in the [CDC] Declaration Form . . . may request an evidentiary hearing before the court." A.O. 154, ¶ 7. Nothing in A.O. 154 provides any limitations or procedures for this evidentiary hearing—including any burden of proof or requirement for threshold evidence of falsity. Staff from Amicus LAWMO report varying results, with some landlords demanding such hearings in all cases and serving burdensome discovery requests on tenants, and others never or almost never doing so. Similarly, some judges have allowed evidentiary hearings automatically, while others have required a showing of good cause to challenge a declaration.[12]

Amici recognize that the halt order's protections only extend to tenants who truthfully make the statements necessary to sign the CDC declaration. *See* 85 Fed.Reg. at 55293. A tenant who does not qualify for coverage should not be able to benefit from the halt order by making a false declaration. At the same time, however, allowing unlimited challenges to declarations denies tenants who do qualify the full benefit of the order. Such a practice implicitly requires tenants to corroborate and document the grounds on which they claim coverage, even though the halt order requires only the sworn declaration. *See* 85 Fed.Reg. at 55293. Unrestricted inquiries into the veracity of tenant declarations may chill tenants who lack corroborating documentation from asserting the protection, may subject tenants to the burden of answering interrogatories or producing documents, and create opportunities for tenants to miss deadlines or otherwise default.

---

[12] Whether or not influenced by A.O. 154, staff from Amicus LSEM have similarly observed tenant declarations being challenged in other Missouri state courts.

10

Allowing automatic hearings on the contents of tenant declarations will also cause some tenants to inevitably be denied its protection simply because they fail to defend effectively in court. In Jackson County eviction cases, 85% of landlords have counsel compared with less than 2% of tenants.[13] Pandemic conditions further increase the difficulties for *pro se* tenants: closures of businesses or government offices may frustrate efforts to obtain records, tenants or witnesses may be deterred from entering courts by infection risks or denied access altogether, and some may struggle with remote hearing technology (which the National Center for State Courts has already cautioned is inappropriate for evidentiary hearings centered on documents and witness credibility).[14] All of these factors increase the likelihood of improper evictions where tenants fail to rebut challenges to the veracity of their declarations, even if the contents are true.[15]

Accordingly, claims challenging the veracity of tenant declarations require a balanced approach. A sworn declaration should serve as prima facie evidence that a tenant is covered—thus placing the burden on the landlord to refuse the tenant's coverage by showing a material falsehood in the declaration—i.e., a substantially false or misleading statement, without which the tenant would not have fulfilled the coverage requirements. As an appropriate standard of proof is a component of procedural due process, *see Addington v. Texas,* 441 U.S. 418, 423

---

[13] Kansas City Eviction Project, "Evictions in the Courts: An Analysis of 106,000 Cases from 2006-2016 in Jackson County" (Jan. 2018), https://static1.squarespace.com/static/59ba0bd359cc68f015b7ff8a/t/5a68e811e4966bee3fb5d6cd/1516824594549/KC+Eviction+Project+-+Courts+Analysis.pdf

[14] National Center for State Courts, Call to Action: Achieving Civil Justice for All, Appx G, p. 3 (Jul. 15, 2020) ("Examples of inappropriate situations [for video hearings] include where there are poor connections, a hearing requires reference to multiple documents, the subject matter is complex, or issues of witness credibility are involved."), https://www.ncsc.org/__data/assets/pdf_file/0022/25726/ncsc-cji-appendices-g.pdf

[15] Again, whether or not attributable to the influence of A.O. 154, advocates in Eastern Missouri (who report just 1.8% of tenants in the six judicial circuits near St. Louis had counsel in eviction cases), have observed the same difficulties for tenants facing challenges to CDC declarations.

11

(1979), courts should not permit landlords to simply launch "fishing expeditions" hoping to detect a discrepancy or inaccuracy in a declaration not otherwise believed false or deceptive. Rather, courts should permit such inquiries only where a landlord presents some evidence calling into question material statements in a specific tenant's declaration.

In an analogous context, the U.S. Supreme Court has required a criminal defendant who contests the statements in a police informant's affidavit used to obtain a search warrant to "point out specifically the portion of the warrant affidavit that is claimed to be false . . . accompanied by a statement of supporting reasons" before obtaining an evidentiary hearing. *Delaware* v. *Franks,* 438 U.S. 154, 171 (1978). The specific public policy reasons for according finality to a CDC covered person declaration may differ from those related to a search warrant affidavits but in both situations, allowing routine challenges harms the public interest—and should thus require more than conclusory allegations or a "mere desire to cross-examine." *Id*. at 171.

### D. The disproportionate racial impacts of both evictions and Covid-19 threaten especially devastating outcomes on communities of color.

While the health impacts of mass evictions would undoubtedly be felt to some degree in every corner of the U.S., the harshest outcomes would fall on communities of color. Multiple studies have shown that renter households of color, especially Black women with children, face eviction at substantially higher rates than other groups[16]—and this has continued during Covid-

---

[16] *See* Matthew Desmond, "Poor Black Women Are Evicted at Alarming Rate, Setting Off a Chain of Hardship," MacArthur Foundation How Housing Matters (March 2014), https://www.macfound.org/media/files/HHM_Research_Brief_-_Poor_Black_Women_Are_Evicted_at_Alarming_Rates.pdf; *see* Tim Thomas, et al., The State of Evictions: Results from the University of Washington Evictions Project (Feb. 2019), https://evictions.study/washington/; *see* David Robinson & Justin Steil, "Evictions in Boston: The Disproportionate Effects of Forced Moves on Communities of Color," City Life Vida Urbana (2020), https://www.bostonevictions.org/

12

19.[17] At the same time, the CDC—referring to research on Blacks and Latinos especially—has recognized "[t]here is increasing evidence that some racial and ethnic minority groups are being disproportionately affected by Covid-19."[18]

These twin harms of housing loss and adverse health outcomes are closely entwined in communities of color because of numerous social determinants of health. Black and Latinx households tend to have less wealth than white households, making them more likely to fall behind in rent if an income disruption occurs.[19] They are less likely to own their homes, which both impedes wealth building and also keeps them susceptible to eviction in difficult financial times.[20] Black, Asian, and Latinx workers are overrepresented in industries facing pandemic-related shutdowns, such as restaurants and hotels, and "often hold occupations that are less stable, such as jobs in retail and home health and jobs as nursing home aides."[21] The same types of jobs also tend to be lower paying, unable to be performed remotely, offer inferior benefits such as paid sick leave, and to present higher risks of infection.[22] People of color are more likely

---

[17] *See, e.g.,* Paul M. Ong, "Systemic Racial Inequality and the Covid-19 Renter Crisis," UCLA Luskin Institute (Aug. 7, 2020), https://ucla.app.box.com/s/t8x503d781kfmocclgdgeibielo0q234
[18] Centers for Disease Control and Prevention, "Health equity considerations and racial and ethnic minority groups" (Jul. 24, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/health-equity-race-ethnicity.html
[19] *See* Kriston McIntosh et al., "Examining the Black-white wealth gap," Brookings Institution (Feb. 2020); *see also* McKernan, *supra* (finding "[l]ow-income families with savings are more financially resilient than middle-income families without savings").
[20] *See* Jung Hyun Choi, "Explaining the Black-White Homeownership Gap: A Closer Look at Disparities across Local Markets," Urban Institute (Oct. 2019), https://www.urban.org/research/publication/explaining-black-white-homeownership-gap-closer-look-disparities-across-local-markets
[21] Danyelle Solomon & Derrick Hamilton, "The Coronavirus Pandemic and the Racial Wealth Gap," Center for American Progress (Mar. 2020): https://www.americanprogress.org/issues/race/news/2020/03/19/481962/coronavirus-pandemic-racial-wealth-gap/
[22] Christian E. Weller, "African Americans Face Systemic Obstacles to Getting Good Jobs," Center for American Progress (Dec. 2019), https://www.americanprogress.org/issues/economy/reports/2019/12/05/478150/african-

to live in housing that exposes them to other health hazards--such a mold or other unsafe conditions within the housing itself, or proximity to environmental pollution.[23]

All of these factors contribute to housing instability, and help explain why there have already been "more Covid-19 cases, hospitalizations, and deaths in areas where racial and ethnic minority groups live, learn, work, play, and worship."[24] By failing to uphold the text and spirit of the CDC halt order, A.O. 154 enables more evictions to proceed—evictions likely to be disproportionately concentrated in communities of color where the overlapping adverse social factors tend to exacerbate outcomes on health and Covid-19 transmission. Amici have no reason the believe these disproportionate effects on minority communities are intentional. But strong public policy favors the protection of these communities and the avoidance of disparate housing impacts. *See* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States.").

**IV. Conclusion**

For the foregoing reasons, a preliminary injunction should be granted.

Respectfully submitted this 26th day of October, 2020, by:

By: ___/s/ Joel Ferber___  
Legal Services of Eastern Missouri  
Joel Ferber #35165  
Lisa D'Souza #65515  
Matt Ampleman #69938 *Petition fo*r *admission pro hac vice to be submitted*  
4232 Forest Park Ave.

By:___/s/Jim Smith___  
Legal Aid of Western Missouri  
Jim Smith #25688  
4001 Blue Parkway, Ste. 300  
Kansas City, MO 64130  
(816) 747-6750  
JSmith@LAWMO.org

---

americans-face-systematic-obstacles-getting-good-jobs/; Elise Gould & Heidi Shierholz, "Not everybody can telework," Economic Policy Institute (Mar. 2020), https://www.epi.org/blog/black-and-hispanic-workers-are-much-less-likely-to-be-able-to-work-from-home/

[23] *See* David E. Jacobs, "Environmental Health Disparities in Housing," 101 Am. J. Pub. Health 115 (Dec. 2011), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3222490/

[24] Solomon & Hamilton*, supra*.

14

Case 4:20-cv-00784-HFS   Document 27-1   Filed 10/26/20   Page 18 of 19

St. Louis, MO 63108
(314) 534-4200
jdferber@lsem.org
ljdsouza@lsem.org
mdampleman@lsem.org


By: \_\_\_/s/Eric Dunn_____
National Housing Law Project
Eric Dunn, *Petition for admission pro hac vice to be submitted*
919 E. Main Street, Ste. 410
Richmond, VA 23219
(415) 546-7000
edunn@nhlp.org