# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

KC Tenants,

    Plaintiff,

v.

David M. Byrn, et al.,

    Defendants.

Case No. 20-000784-CV-W-HFS

MEMORANDUM AND ORDER

Plaintiff KC Tenants, on behalf of impoverished tenants in Jackson County, has sued the Court Administrator, Ms. Marquez, and Judge Byrn, Presiding Judge of the 16th Judicial Circuit Court, for allegedly violating a federal Order ( referred to here as a "Moratorium") regarding evictions for certain tenants in default on rent obligations. The Moratorium, effective September 4, 2020, as imposed nation-wide by the Centers for Disease Control (CDC or the Agency) expires (subject to renewal) on December 31, 2020. The CDC's stated general purpose and legal justification for issuance of the Moratorium temporarily halting residential evictions was to reduce

1

homelessness and prevent the further spread of exposure to COVID-19. To be eligible as a "Covered person" a tenant, lessee or resident of a residential property must provide to their landlord, owner of the residential property, or other person with a legal right to pursue eviction, a Declaration, or similar form, under penalty of perjury indicating that the individual (based on certain stated reasons) is unable to pay rent.

The Presiding Judge, in what he (and presumably other members of the court), considered compliance with the Moratorium, established changes in state court landlord/tenant practice by issuance of an Administrative Order. This included a system of current judicial testing during the period of the Moratorium of grounds asserted by tenants in a Declaration.

KC Tenants essentially contends the grounds asserted by tenants for protection against evictions are conclusively binding during the four month period and cannot be tested in hearings, although the Moratorium makes them subject to challenge in criminal prosecutions for perjury.

The suit filed in late September prays for several forms of relief, including a preliminary injunction, the subject of this order. Briefing and argument has occurred, pursuant to a scheduling order. Timing has been complicated by plaintiff's filing a formal motion for preliminary injunction in late October and

defendants Marquez and Byrn filing both a motion to dismiss and a response to plaintiff's motion. Defendants' motion to dismiss deals with procedural issues challenging this proceeding on standing and jurisdictional grounds.

Because we are in somewhat of a time-bind if this case has a potential for any practical effect during the next five weeks, I must necessarily deal summarily with some peripheral issues. This might be questionable practice if I were to grant a preliminary injunction, but perhaps not in a denial, as is occurring here. A rather summary ruling may serve the parties better than, for instance, running out of time on procedural matters or insisting on immediate search for a specific tenant in need of protection from a new filing, when it seems obvious there are such persons. Thus I am assuming arguendo that plaintiff has standing to litigate on behalf of needy tenants. But I will deal with a serious problem of my authority as a federal judge to disable Missouri judges from handling new landlord-tenant filings against "covered tenants". I will first rule, as an alternate ground for rejecting a preliminary injunction, whether there is very probably a real conflict between the CDC Moratorium provisions and the Missouri court's Administrative Order.

Determining the likely outcome on the merits of KC Tenants' legal claim avoids frustrating the interested parties and those filing amicus briefs by

simply ruling on "technicalities" (the right of a federal judge to effectively enjoin state court proceedings).

Part I.

Turning to the merits, plaintiff KC Tenants contends that landlords violate the allegedly "unambiguous" language of the Moratorium when they file a suit seeking to ultimately evict a tenant who has certified facts that invoke the Moratorium. After a good deal of consideration, I presently disagree with plaintiff.

The Moratorium has a definitional section (page 1) which defines "evict" and "eviction" as "any action by a landlord…with a legal right to pursue eviction or a possessory action, to remove, or cause the removal of a covered person…" As noted, the Administrative Order under attack does not allow evictions of covered persons during the remainder of the year, but does allow filing and processing of suits, and hearings to test the grounds asserted by delinquent tenants for claiming an exemption from eviction. Plaintiffs believe that this latter practice of permitting the filing and processing of suits and hearings to test the grounds asserted by delinquent tenants is forbidden by the Moratorium, because they say it is an action "to remove, or cause the removal" of delinquent tenants who have filed Certificates claiming exemptions. They offer no authority but assert the language

4

is clear and unambiguous. I believe they are mistaken. The language is elastic, possibly meaning various things. It has no fixed meaning

The Moratorium (Doc. 1-2) at page 4, provides that landlords "shall not evict any covered person" --that is, a tenant who has supplied a certificate to the landlord. In Missouri a suit to evict, if successfully prosecuted, results in a writ of eviction, which is then taken to a sheriff who has the sole authority to begin the actual dispossession of a tenant. A narrow or "strict" reading would be that it applies only when an actual physical removal is about to be undertaken, after a writ of eviction has been obtained. The prohibition of "any action" to "cause the removal" of a tenant simply means that an evicting officer shall not be sought out, or a moving van obtained, or some similar conduct undertaken to achieve an actual eviction. The earlier paper work is preliminary to even beginning a physical eviction, which is all that is forbidden by the Moratorium.

KC Tenants' reading of the Moratorium words, which can be characterized as a broad or loose reading, would logically forbid all activity related to an eviction such as hiring a lawyer, or sending a notice, or filing suit, or obtaining money for a filing fee. What did the CDC mean? When the words in the Moratorium are read in context, regarding specified evictions and none of the other practices that the plaintiff treats as problematic, it seems that it was only certain evictions were

5

forbidden, and not the unmentioned remote preliminaries. The Moratorium permits various other types of evictions, i.e., for crimes, damaging property, and even failing to deliver a Certificate. The activity preceding an eviction, including lawsuits, is necessarily permitted under the Moratorium.

It is unreasonable to suppose that "covered persons" are protected from preliminary law suits and the like, not mentioned in the Moratorium, when only removals or evictions are forbidden for protected tenants before January 1. I find nothing in the Moratorium that arguably prevents getting ready to evict early in the New Year. While the preliminaries may be a very unfortunate practice, deeply troubling to tenants and even a health hazard, as the argument is developed by plaintiff and by amici, judges have no authority to add new requirements to the CDC regulations. Thus, I find nothing in the Moratorium language that conflicts with the Circuit Court's Administrative Order.

In construing language that has no fixed meaning, it is necessary to read it in the context of the whole document under consideration. See the discussion by Justice Ginsburg in <u>Yates v. United States</u>, 574 U.S. 528, 537-9 (2015), using Judge Learned Hand's reference to words as "chameleons" that often change color and therefore must be viewed in their "environment". Plaintiff's argument fails to do this, and reaches beyond the context of the Moratorium. As the Circuit has

6

frequently noted, "context and common sense" need to be used in construing words. Ritroma, Inc. v. HDI-Gerling Am. Ins. Co., 796 F3d 962, 966 (8th Cir 2016).

Another reason for reading the Moratorium language narrowly or "strictly" is that violations of the Moratorium can be prosecuted and violators can be jailed and/or fined. Strict or narrow construction is necessary to be sure that alleged violators have adequate notice of what is being forbidden. Vague and elastic language should not be applied to enlarge the reach of a criminal statute. Only a forbidden eviction, or actions undertaken in an attempt to enforce a writ of eviction, would qualify for an indictment.

My conclusion that the Administrative Order is very probably consistent with the Moratorium (the strongest language I should use in evaluating a preliminary injunction motion) signifies that my understanding of the Moratorium at this stage of the proceeding is similar to that of the Presiding Judge and presumably other members of the Circuit Court. Their reading of the language is doubtless as capable as mine, and they are not to be discounted as partisans just because the Presiding Judge has been sued; they are neutrals by profession in their approach to landlord-tenant issues.

Moreover, within days of the filing of this case, plaintiff's argument received a bitter set-back when the CDC itself, author of the Moratorium plaintiff is trying

7

to protect, published an answer to "Frequently Asked Questions" that in effect endorses the action of the Missouri court. In a "non-binding guidance document" responding to the Agency--posed question. "what can a landlord do…if the landlord does not believe the tenant actually qualifies" for protection from eviction, CDC responded, "The Order does not preclude a landlord from challenging the truthfulness of a tenant's declaration in any state or municipal court. The protections of the Order apply to the tenant until the court decides the issue as long as the Order remains in effect" Doc. 32-1, p. 6 ….

Plaintiff urges me to disregard the CDC statement, challenging its procedural legitimacy, and arguing that it is tainted as a belated rationalization—helpful to the CDC in defense of suits challenging the validity of the Moratorium. I am aware of Eighth Circuit decisions questioning some FAQ pronouncements as attempts to informally amend regulations but am inclined to view this one as interpretive—simply noting that the Moratorium language does not contain any prohibition on the type of state court litigation in dispute here. At a minimum it discloses CDC's "current thinking", which is some forecast of how the Moratorium will look in January, assuming a renewal. For these reasons, although preliminary injunction practice requires me to remain open to ultimate reconsideration, for present

8

purposes I conclude that the Administrative Order is not in conflict with the Moratorium and thus plaintiff's preliminary injunction motion is not well taken.

Part II.

The familiar Dataphase considerations in this Circuit, in addition to considering plaintiff's likelihood of success, discussed above, yield modest guidance in this case. Plaintiff and amici have submitted impressive material and argument that there are great numbers of impoverished persons in Jackson County, many having suffered job losses because of the pandemic, with families and individuals who would be homeless or dangerously doubled-up if evicted for rental defaults. With limited resources, deferring rent payments must be a common occurrence. But if anyone can change the law in their favor, such persons would be in the executive or legislative branches of government, not the judiciary. The relief sought here is quite limited—stopping a class of new eviction law suits for the next five weeks. Plaintiff does not seek an order that pending eviction cases be stayed. Presumably filings since September considerably outnumber what may be anticipated between Thanksgiving and the New Year. One might suppose that as winter sets in, eviction proceedings, like utility shut-downs, would be quite limited, and that court proceedings, already affected by the pandemic, would not be very active. Filings by the associate circuit judges (in

exhibits attached to the opposition to plaintiff's motion) confirm very modest trial activity and of course no evictions. While a brief injunction against new filings might provide some relief for some tenants this would be of very limited help for the crowds of local protestors whose actions have been publicized. The judge and court administrator defendants would not themselves be materially harmed by a brief prohibition on filings, but of course a few potential landlord plaintiffs would be prejudiced by any delayed preparation of eviction cases for next year. An amicus brief develops the story of landlord difficulties, some of whom could be facing foreclosures or bankruptcy for lack of funds to pay their obligations.

Other factors that must be considered require balancing harms with respect to both plaintiff (and others potentially subject to eviction proceedings due to an inability to pay rent at this time) with the economic losses claimed by landlords. Viewing this alone I assume this somewhat favors plaintiff.[1] But a preliminary injunction could be publicly perceived by many as indicating that parts of the Missouri judicial system are operating in a defective manner, heedless of human suffering, and needing federal court guidance. Public

---

[1] The harm claimed might be alleviated, however, if an associate circuit judge would grant such a stay. Reasons for a stay might be (1) to seek and obtain free legal aid (a ground for stay in our cases) or (2) to avoid wasteful litigation in the probable event the Moratorium is renewed, when the record made in December might need to be redone if litigation is resumed in four to six months--some of the pertinent facts might well change. While this court might consider a general stay until January for these reasons, that would be inappropriate given my view of the merits and to avoid heavy-handed federal intervention when the state court judges (who have infinitely better understanding of the docket) are free to take appropriate action.

criticism by a federal judge of the state judiciary and advancing a misleading concept of the federal court as a benign supervisor should be avoided when otherwise feasible. Rather more concerning, however, is the confusion and misinformation that would result from a five-week prohibition on certain filings. Like emergency election litigation that confuses the public, confusion emanating from this case should be discouraged. Wouldn't the relief sought by plaintiff stop all evictions? No, as with the Moratorium itself, it only deals with a certain limited class of tenants, and for a very short time. The relief sought does not immediately affect evictions at all, which, for those "covered" individuals, are not taking place—but will begin—unless the CDC acts—in January, 2021. The relief sought would not stop processing eviction cases that have already been filed; it would be limited to prevention of new filings for the next five weeks.

Even parties who are likely to prevail are sometimes denied preliminary injunctions when serious confusion will likely result. See, e.g. a ruling by Justice Douglas in <u>Gomperts v. Chase</u>, 404 U.S. 1237 (1971). In this case, where, as ruled earlier, plaintiff is very unlikely to establish conflict between the Circuit Court Administrative Order and the CDC Moratorium, this review of the other Dataphase factors does not materially advance the claim of KC Tenants for a

preliminary injunction. It certainly does not outweigh my current view of the legal merits.[2]

Part III.

Even if plaintiff could establish conflict between the Moratorium and the Administrative Order, and a need for relief, it is quite doubtful it could establish an equitable right to obtain relief from a federal court. It is asking the court to intrude directly on state court operations by ordering a Court Administrator to disregard her obligation to accept certain new case filings—thus disabling the state court from handling a portion of its docket. This is docket control litigation, however disguised in form. The Eighth Circuit has several times instructed the district judges that they must carefully exercise "comity" in dealing with the state courts, and give due respect for "federalism". Plaintiff's' motion, if granted, would be harmful to these objectives in attempting to help with another problem.

When a state trial judge commits error, in litigation and in establishing procedures to be followed, correction of the error almost invariably comes from the state appellate courts. If a proceeding violates state or federal constitutional

---

[2] The parties will note that what have been referred to as due process issues—contentions about a miscellaneous array of practices that are generally condemned by plaintiff as unfair—are not evaluated in this ruling. They have not been separated out and adequately briefed or emphasized in argument as constitutional issues. If not further dealt with in this litigation it may be hoped that the Circuit Court will review the problems referred to and, where meritorious and feasible, some procedural changes will be made. My impression is that the problems pale in significance with the enormous difficulty posed by the absence of counsel of record for indigent tenants who are defendants.

12

Case 4:20-cv-00784-HFS   Document 63   Filed 11/24/20   Page 12 of 18

law, as in federal preemption, (as claimed here), a writ of prohibition is the standard procedure for getting rapid correction. See, e.g, <u>Nevils v. Group Health Plan</u>, 492 S.W.3d 918 (Mo. banc 2016)(overruled on other grounds); <u>State ex rel. Ferrara v. Neill</u>, 165 S.W.3d 539 (Mo.App.E.D. 2005). As in <u>Nevils</u>, if the Missouri appellate courts make a bad call, certiorari may correct them.

Counsel have cited various decisions where abstention-type issues have been litigated, some dealing with state court judges and court officials such as court reporters, clerks and court administrators. The Eighth Circuit cases do not seem to be much on point; that is, they deal with situations quite unlike the principles posed that are being considered here. But in <u>Loften v. United States District Court</u>, 882 F.2d 300, 301 (8th Cir. 1989), where there were conflicting jail instructions between a federal judge and a state court judge, while the Circuit directed retention of jurisdiction, Chief Judge Lay cautioned that "comity and federalism" must be given full consideration.

<u>Hoover v. Wagner</u>, 47 F.3d 845 (7th Cir. 1995) is a Posner opinion of interest because of its wide-ranging, if summary, reach. It dealt with an allegedly too restrictive state court abortion-protester order and an ensuing federal proceeding to enjoin the state court judge from violating protester rights. The Seventh Circuit rejected the federal case, partly on other grounds but also

13

pointedly because of the potential threat of criminal contempt proceedings against a state court judge, which it concluded deprived the federal controversy of equitable justification. In the present case there would probably be a more satisfactory rationale. A conceivable, perhaps probable, ruling would be that an adequate state court remedy in prohibition (on behalf of tenants in eviction proceedings) deprives plaintiff of the necessary showing of sufficient need for federal equity intervention.

Enjoining judges for alleged violations of 42 U.S.C. Section 1983 was tested in the Supreme Court in Pulliam v. Alden, 466 U.S. 522 (1984). Only five justices, in a Blackmun opinion, concluded there was jurisdiction to enjoin judges, but there were strong warnings against more than infrequent use. Id. 522, 539, 541-2, In particular, "relief is not appropriate where an adequate remedy under state law exists." n. 22. The Court acknowledged that very restrictive application of Section 1983 to the state judiciary may seem to conflict with Reconstruction Period history, but "It no longer is proper to assume that a state court will not act...or that a state judge will be implicated" in a constitutional violation. Id. 541. Subsequently, in 2004, Congress further narrowed injunctive relief against state court judges, by amending Section 1983 to require a declaratory judgment before considering an injunction against a judge. That is perhaps the reason plaintiff

does not seek to enjoin Presiding Judge Byrn at this time. But is there a sound difference, or only a cosmetic difference, between enjoining judges directly and disabling them from processing a docket by also enjoining staff or a Court Administrator?[3] Or should we disregard the possibility of contempt proceedings against staff members for performing their usual duties?

In this case, as stated above, the Blackmun reference to "adequate remedy under state law" in the context of enjoining judges may thus be invoked as a separate ground for denying a preliminary injunction against Ms Marquez.[4] A decision referred to in argument was Gilbert v. Ferry, 401 F.3d 411, n. 1 (6th Cir. 2005). In that case the Sixth Circuit panel was so concerned that it volunteered a reference to an unappealed ruling that the State Court Administrator in Michigan could not be ordered by a federal court to reassign cases to other judges where the Michigan judges were accused of bias, thus creating a due process need to be removed from hearing certain cases. The opinion of the Circuit observed that the Court Administrator "has no power to remove and re-assign cases, but rather

---

[3] I am not much taken by Judge Posner's concern in Hoover about the danger of imprisoning a judge for criminal contempt--perhaps an unbearable fine or imprisonment for civil contempt might be more likely. But I recognize no material difference between that danger to the judiciary and the inappropriate danger of prison for a Court Administrator, staff person or the like.

[4] This somewhat forecasts a denial of defendants' motion to dismiss; thus, staying the action while plaintiff seeks a writ of prohibition in the Missouri system, if it is still persuaded there is conflict between the Administrative Order and the Moratorium.

works solely under the supervision and direction of the Michigan Supreme Court". Thus, the State Court Administrator was found to be "absolutely immune from injunctive relief under the judicial immunity doctrine." Here, the Court Administrator works for the Circuit Court, and thus has no role in picking and choosing what cases to accept for processing by the court. Her judicially-declared "immunity" from federal injunctive relief,  because of performing her tasks, seems comparable to that of the State Court Administrator in Gilbert.[5]

But plaintiff refers to the case as an outlier, and probably wrongly decided in favor of the State Court Administrator.  But whether mandatory or as a matter of sound discretion should he have been enjoined by a federal judge?  I would suppose not, and find it hard to imagine any  federal district judge enjoining the Court administrator.  The more obvious reason might be that there are standard means for challenging  decisions of the Michigan Court,  and a federal district judge is not in the line of correction. Certiorari was ultimately used for that problem.  Caperton v. A.T.Massey Coal Co.,  556 U.S. 868 (2007).   Plaintiff would

---

[5] If the "abstention" that would be likely here, if necessary, and did occur in Gilbert, deserves a name and subject matter description,  it relates to discouraging federal court intervention in managing portions of a state court docket.   My understanding of abstention, like recusal and sentencing for example, is that established categories, while helpful, are not exclusive. Decisions are driven by special facts. Odd-ball circumstances justify and require unusual results. Because this issue may rarely occur, however, a separate category may be unhelpful, and "abstention" may be  treated as simply following the Pulliam doctrine, which is an abstraction rather than situational.

16

Case 4:20-cv-00784-HFS   Document 63   Filed 11/24/20   Page 16 of 18

likely assert that state court prohibition practice would not offer adequate relief here.  Perhaps not today, but if plaintiff represents indigent tenants,  including those supposedly sued earlier, would an early October effort have been considered a legally adequate remedy?  My current supposition is that it would, given what happened in Gilbert, and perhaps including Hoover.

    Plaintiff has referred to Shelley v. Kraemer, 334 U.S. 1 (1948),  as a supporting citation.  It did rule that Missouri courts should not enforce racially restrictive covenants.  But I am aware of no cases where court clerks were ordered by federal courts to decline accept no filings of such cases, even though it might be argued, as here, that the mere processing of cases is burdensome (or perhaps chilling, as in Shelley).  This illustrates that the relief sought here, federal court intervention stripping down a state court docket, is extraordinary, possibly unprecedented.  Perhaps factually compelling cases can be located before a final injunction ruling, if the case avoids mootness in January, but the briefs on file seem to  lack supporting authority dealing with the type of situation posed in this case.[6]

---

[6] Rather than lengthen and delay this ruling I refer to defendants' recent brief (Doc. 62) for citations and discussion about enjoining state court clerks.

For the foregoing reasons the Motion for a Preliminary Injunction (Doc. 25) is hereby DENIED.

/s/ Howard F. Sachs

**HOWARD F. SACHS**
UNITED STATES DISTRICT JUDGE

November 24, 2020

Kansas City, Missouri